*In re* MARRIAGE OF EFREN C. NAGUIT, Petitioner-Appellee and Appellant, and CHERYL D. NAGUIT, Respondent-Appellant and Appellee.—CHERYL D. NAGUIT, Plaintiff-Appellant, *v.* JAMES E. SCRIVNER *et al.*, Defendants-Appellees.

Fifth District    Nos. 81-75, 81-152 cons.

Opinion filed March 8, 1982.

Michael Pasko, of Buckner, for appellant Cheryl D. Naguit.

Robert E. Becker, of Kassly, Bone, Becker, Dix & Tillery, P. C., of Belleville, for appellee Efren C. Naguit.

Harry J. Sterling, of Sterling and Altman, P. C., of Fairview Heights, for appellees James E. Scrivner and Jeannette R. Scrivner.

JUSTICE KASSERMAN delivered the opinion of the court:

This appeal involves two cases which have been consolidated for argument and opinion. The first (cause No. 81-75) concerns the marriage of Efren C. Naguit, petitioner, and Cheryl D. Naguit, respondent. The second (cause No. 81-152) pertains to a forcible entry and detainer action brought by respondent against James E. Scrivner and Jeannette R. Scrivner, defendants. Both of these cases share as a common link disputes involving a house located at 812 West Lakeshore Drive, O'Fallon, Illinois (O'Fallon residence). For purposes of clarity and convenience, the facts and issues of each case will be discussed separately.

On September 8, 1978, petitioner, Efren C. Naguit, and respondent, Cheryl D. Naguit, were married. On November 29, 1978, petitioner filed for a declaration of invalidity of marriage (formerly referred to as an annulment) pursuant to section 301 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 301). The petitioner alleged that respondent committed fraud involving the essentials of the marriage and lacked the physical capacity to consummate the marriage. On June 20, 1979, respondent filed a cross-petition for temporary maintenance and for legal separation. The respondent subsequently replaced her request for a legal separation with a cross-petition seeking dissolution on the grounds of mental and physical cruelty. On February 25, 1980, respondent was awarded temporary maintenance.

On June 2, 1980, the petitioner's request for a declaration of invalidity of marriage and respondent's amended petition for dissolution came on for hearing. Respondent voluntarily dismissed her petition for dissolution, and the trial court proceeded to hear evidence on the petition seeking to invalidate the marriage. At the close of petitioner's case, he requested leave to conform his pleadings to the proof by amending his petition to include two alternative counts seeking dissolution. The trial court allowed petitioner's motion to amend his pleadings and granted respondent's motion for a judgment in her favor regarding the petition for a declaration of invalidity of marriage.

On June 18, 1980, petitioner's request for dissolution was heard by the trial court and granted on the ground of respondent's mental cruelty. The hearing on the issues of property and maintenance was continued. On June 24, 1980, respondent appealed from an order of the trial court entered June 9, 1980, denying respondent's request for an increase in temporary maintenance, and the court's June 19, 1980, order granting the dissolution of marriage. This court dismissed respondent's interlocutory appeal as premature (cause No. 80-295).

The hearing on the issues of property and maintenance took place on November 5, November 24, and December 18, 1980. A final judgment of dissolution of marriage was entered on January 19, 1981. On February 10, 1981, respondent filed a notice of appeal. Seven days later, petitioner filed notice of a separate appeal challenging the trial court's denial of his petition for declaration of invalidity of marriage.

At trial, respondent was called as an adverse witness. She stated that she was 26 years of age, that she had been married previously in 1970 and had borne a daughter in 1972, and that she was divorced in 1973. She testified that she began to see petitioner on a social basis late in 1973 and that sometime in 1976 petitioner brought up the subject of marriage. According to respondent, petitioner spoke in terms of getting "married for convenience sake." Respondent declined the offer of marriage, but she and petitioner continued dating.

Respondent related that she suffered emotional and psychological problems during her first marriage which made it difficult for her to respond sexually to a man. She stated that she mentioned these sexual difficulties to petitioner but never discussed them in detail with either him or her parents. Respondent testified that prior to her marriage to petitioner, she had never sought treatment for her sexual problems. According to respondent, the day before she and petitioner were married she told him that she could not consummate the marriage, explaining to petitioner "that physically for me right now I cannot * * * be really married to you * * *." She stated that when petitioner responded that she should seek psychiatric help, she agreed and the marriage took place as

planned. Respondent testified that she has never had any sexual relationship with the petitioner either before or after the marriage.

Respondent further testified that on September 5, 1978, she and petitioner signed an antenuptial agreement, which provided, *inter alia*, that petitioner would furnish a home for respondent and her daughter during the marriage. The agreement further provided for the disposition of certain property in the event of the death of either party. Respondent testified that at the time she signed the agreement she felt intimidated by the presence of "bank presidents and lawyers" and that she was under the impression that she was supposed to sign a will until the antenuptial agreement was presented to her. She also stated, however, that no one forced her to sign the agreement and that she signed it of her own free will. In its final judgment of dissolution of marriage the trial court expressly found that the antenuptial agreement was valid and noted that it contained no provision regarding dissolution of marriage.

Cletus Zotz, respondent's ex-husband, testified regarding his marriage with respondent. He stated that he and respondent began to have difficulties with their sexual relationship during the last year of their marriage but respondent never indicated that she had any particular problems with sexual intercourse.

Robert Nesler, respondent's father, said he was unaware of the exact nature of respondent's problems with her first husband. He testified that the marriage between petitioner and his daughter was "on one day and off the next." Mr. Nesler further related that he and petitioner discussed the pending marriage and that the petitioner expressed a willingness to marry respondent. Mr. Nesler said he told petitioner that "if you take the sex out of marriage * * * I think she'd marry you tomorrow."

Petitioner, a 49-year-old physician, testified that he became acquainted with respondent in his role as respondent's family doctor when she was about 12 years of age. He related that he began dating respondent in late 1973 and first discussed marriage with her in 1977. According to petitioner, he and respondent began to make marriage plans in 1978 but respondent kept postponing the date. Petitioner and respondent eventually were married on September 8, 1978, in Reno, Nevada; and petitioner stated that upon their return, respondent and her daughter moved into the O'Fallon residence, which petitioner had purchased prior to the wedding. About two weeks later, after vacating his former apartment, petitioner also moved into the house.

Petitioner denied ever discussing a marriage of convenience with respondent or her family and stated that he never agreed to a sexless marriage. He testified the only sexual problem which respondent discussed with him was the fact that respondent's first husband had once beaten and sexually attacked her. Regarding the conversation he had with

respondent the day before the wedding, petitioner testified that respondent's sexual problem was explained to him "more or less in general terms, that she didn't think she could function as a housewife in the sexual context of the word * * *."

After their marriage, respondent began psychotherapy. Petitioner related that about a month after the wedding, he asked respondent whether she felt the sessions with the psychiatrist were helping her to overcome her sexual problems, at which time respondent became belligerent and harsh words were exchanged. According to petitioner, whenever petitioner brought up the subject of respondent's sexual problem thereafter she would reply that "there is nothing to talk about." Petitioner testified that about the third or fourth week of marriage respondent ceased fixing his meals and frequently stayed out by herself late at night. He said respondent lived upstairs at the O'Fallon residence while he resided downstairs during the time they lived there together.

Petitioner testified that after their marriage he had made several physical advances towards respondent, but when he tried to hug and kiss her, she would push him away. He related that eventually the frustration of being rejected caused him to cease his attempts at physical contact with respondent. Petitioner recalled three specific instances when respondent had rebuffed his efforts to establish physical intimacy with her. He stated that his wife's repeated rejection of him coupled with her late night excursions caused him to lose sleep. He indicated that his marital situation aggravated his hypertension, may have resulted in a heart condition called ventricular hypertrophy, and interfered with his ability to perform as a physician.

At the conclusion of the hearing, petitioner moved to conform his pleadings to the proof and was allowed to amend his petition seeking to invalidate the marriage to include as an alternative a request for dissolution on the grounds of both desertion and mental cruelty. The trial court, upon motion by respondent, dismissed petitioner's request for a declaration of invalidity, finding that no fraud involving the essentials of the marriage was shown to exist and further finding that any physical incapacity to consummate the marriage was not of a sufficient duration to warrant a declaration of invalidity.

At trial, respondent presented the testimony of four witnesses. Sharon Link, the medical-legal clerk at St. Elizabeth's Hospital in Belleville, Illinois, testified that hospital records showed that respondent was admitted as a patient five times in 1979 for various ailments. Petitioner was briefly examined as an adverse witness concerning his knowledge of respondent's medical problems and reiterated that respondent continually rebuffed his sexual advances. Anne Nesler, respondent's mother and a licensed practical nurse, testified that she had administered a drug to her

daughter which was prescribed by petitioner. Also, respondent testified in her own behalf.

Respondent stated that, pursuant to petitioner's request, she began psychotherapy for her sexual problems with Dr. Robert J. Corday soon after the marriage. She indicated that petitioner, who at first supported her psychotherapy, became hostile toward the treatment. She testified that from the beginning of their marriage there were difficulties and related that when petitioner insisted that she be more emotional, her reaction was to become very defensive.

Respondent also testified that a few days after the wedding petitioner told her "if it doesn't work out we can always get divorced." There was no further discussion of possible legal action to terminate the marriage until respondent was informed by a friend that petitioner had filed a petition seeking to invalidate the marriage. Respondent stated that when she confronted petitioner with this information, petitioner informed her that he wanted out of the marriage because he wanted a closer marriage with more emotional involvement and that he was disappointed with the results of her psychotherapy. She testified, however, that petitioner never stated in express terms that he desired a sexual relationship with her.

On cross-examination, respondent stated that her physical ailments were not the sole reason she would not consummate the marriage. She explained that the absence of a sexual relationship with petitioner was due to her understanding that they both agreed to a sexless marriage. She denied telling petitioner that there was nothing to talk about regarding her sexual problem and also denied pushing petitioner away. She said petitioner never placed her name on the title to the O'Fallon residence and that when petitioner sold the house, he placed in storage her personal belongings which were on the premises.

Respondent introduced the evidence deposition of Dr. Robert J. Corday, who diagnosed her condition as a depressive neurosis. Dr. Corday stated that respondent's prognosis was good but that it might take a couple of years of psychotherapy before she was completely cured.

Between November 5, 1980, and December 18, 1980, the trial court conducted a hearing on the property issues. On the first day of this hearing petitioner testified regarding his finances, income and expenses. His 1979 income tax return showed a total income of about $137,000. Petitioner introduced a list of checks payable on respondent's behalf for various debts she incurred. These checks totaled over $20,000 and showed that petitioner had paid temporary support payments over $4,000. Petitioner also testified that his medical opinion as one of respondent's treating physicians was that none of respondent's physical ailments were of a permanent nature.

Regarding the antenuptial agreement, petitioner said he discussed it

with respondent on two occasions prior to her signing it. He said that the contents of the agreement were fully explained to her at the time of signing. The antenuptial agreement was admitted into evidence over respondent's objection.

Petitioner further testified that he purchased the O'Fallon residence for himself and respondent to live in after their marriage. When he later sold the house, a $10,000 escrow account was opened to cover any homestead claim respondent might have. Petitioner stated that he informed his wife that the people who purchased the house would be taking possession, which would necessitate her moving out but that she failed to do so. According to petitioner, subsequently, sometime in November 1979 he purchased another house at 22 Chateau Drive, Belleville, Illinois, where he resided at the time of trial.

As to respondent's medical problems, petitioner stated that he was told by Dr. Stuart W. Mauch, Dr. David S. Wiltsie, Dr. Stephen B. Overton, Dr. Cletus B. Boeshart, and Dr. Arthur Smith that the illnesses for which they treated respondent were not of a permanent nature. The testimony and evidence depositions of the first four of these physicians, introduced on November 24, 1980, corroborated petitioner's statement.

Petitioner, when recalled to testify, stated that respondent, who made no monetary contribution, withdrew approximately $2,000 from a joint account for a trip and a color television. On cross-examination, he said respondent had nothing to do with the sale of the O'Fallon residence and never signed the deed conveying the property. At trial, respondent contended that the O'Fallon residence was marital property, but she never asserted any homestead right in the premises during the dissolution proceeding.

On the final day of the hearing on property issues, respondent completed her testimony. She related that she then was being treated by Dr. Adiraju Palagiri for urological problems and by Dr. William H. Fraley for a pelvic infection. In his evidence deposition, Dr. Palagiri stated that he was treating respondent for urethral stenosis, that her prognosis was good and the condition curable. Dr. Fraley's evidence deposition indicated that he diagnosed respondent as having pelvic inflammatory disease but that she was presently receiving no treatment because she was not suffering from any symptoms at that time.

Respondent testified that prior to the marriage petitioner had promised to put her name on the title of the O'Fallon residence. She denied knowing that the house was being sold by petitioner prior to discovering that the purchasers had moved in. She related that her personal belongings in the house were placed in storage without her permission.

Respondent testified that she made no financial contribution to the marriage because she was not working. She stated that she had a high

school diploma and that she attended college for two years and was eligible to enter a nursing curriculum. She worked as a receptionist in a law office, as a medical secretary at a hospital, and as petitioner's medical assistant prior to their marriage. She testified that her highest pay was $4 an hour. Regarding the prospect of future employment, respondent related that she hasn't sought a job and had no future plans to do so while under psychiatric and medical care.

After respondent rested her case, her attorney requested that she be awarded attorney fees and submitted as proof of such fees an itemized statement listing the charges for his services. The trial court requested further evidence regarding attorney fees and petitioner's attorney objected to the method utilized by respondent's counsel to prove such fees. Respondent's counsel declined to submit further evidence regarding attorney fees, and his request for attorney fees was denied.

The trial court entered its judgment of dissolution of marriage in final form on January 19, 1981, in which it found, *inter alia*, that respondent was guilty of extreme and repeated mental cruelty and that respondent's mental condition did not preclude her from furthering her education or obtaining employment. The court determined that the O'Fallon residence was nonmarital property and awarded respondent rehabilitative maintenance in the amount of $16,000. Respondent was ordered to remove her personal property from storage within 21 days or be held liable for storage fees. The court found that respondent had dissipated marital resources and that both parties had a reasonable opportunity for further acquisition of capital assets and income. Respondent was ordered to pay her own medical expenses and attorney fees.

Both petitioner and respondent filed timely notices of appeal. On April 23, 1981, petitioner filed a motion in this court to dismiss respondent's appeal under the release of errors doctrine. Respondent filed objections to this motion. Respondent then filed a motion to dismiss petitioner's appeal on the grounds that it was not properly labeled under Supreme Court Rule 303(a) (73 Ill. 2d R. 303(a)). Alternatively, respondent contends that since petitioner requested the alternative remedies of a declaration of invalidity of marriage and dissolution, either the doctrine of waiver, estoppel, or election of remedies precludes his appeal. Petitioner filed objections to respondent's motion to dismiss. The motions to dismiss filed by petitioner and respondent were taken with the case.

■■ Petitioner seeks to have respondent's appeal dismissed as moot under the release of errors doctrine, under which a party is precluded from attacking a divorce decree when to do so would place the opposing party at a distinct disadvantage if the cause were reversed on appeal. (*Royster v. Hammel* (1977), 51 Ill. App. 3d 710, 366 N.E.2d 535.) He contends that

respondent's acceptance of maintenance payments prevents her from appealing from the judgment of dissolution. A similar argument was rejected in *Castronovo v. Castronovo* (1977), 50 Ill. App. 3d 97, 99, 365 N.E.2d 232, 234, in which the court held that alimony payments do not necessarily place the party making such payments in a "distinctly disadvantageous position." (See *Lemon v. Lemon* (1958), 14 Ill. 2d 15, 150 N.E.2d 608.) We concur with the analysis set forth in *Castronovo* and decline to determine that the present appeal is moot on the grounds that respondent accepted maintenance payments.

■■ Respondent seeks dismissal of petitioner's appeal on the grounds that petitioner failed to properly label his notice of appeal. She claims that petitioner's failure to indicate whether his appeal was a cross-appeal or a separate appeal under Supreme Court Rule 303(a) (73 Ill. 2d R. 303(a)) justifies a dismissal of his appeal. We disagree. While petitioner admittedly has failed to comply with this procedural rule, we conclude that the sanction of dismissal is too harsh for such non-compliance in light of the fact that respondent has suffered no prejudice. Respondent has filed her brief which directly addresses the petitioner's contentions on appeal. Hence, the disruption in the briefing schedule which the labeling requirement of Rule 303(a) was designed to prevent (see Ill. Ann. Stat., ch. 110A, par. 303, Committee Comments, at 322 (Smith-Hurd Supp. 1981)) has not prevented respondent from presenting her position to this court. Under the circumstances here presented, we decline to dismiss petitioner's appeal for failure to designate the type of appeal he sought. To do so would unduly emphasize form over substance and would, we believe, unjustly deprive the petitioner of his right to review.

■■ Respondent also argues that since petitioner requested in the alternative a declaration of invalidity and dissolution of the marriage, he cannot now appeal from the judgment dissolving the marriage. This argument ignores the fact that petitioner does not attack the judgment of dissolution on appeal but seeks review only of the trial court's denial of his request for a declaration of invalidity. Moreover, we can perceive nothing inherently inconsistent with alternatively seeking either to invalidate or to dissolve a marriage. We are not persuaded that waiver, estoppel, or election of remedies or any of the theories advanced by respondent operate to preclude petitioner's appeal. Therefore, we conclude that both petitioner's and respondent's appeals are properly before this court.

Petitioner raises two issues on appeal. He maintains that the trial court erred in denying his request for a declaration of invalidity of marriage because the evidence established either (1) that the respondent committed fraud involving the essentials of the marriage or (2) that respondent had a physical inability to consummate the marriage for a

sufficient period of time to warrant invalidating the marriage. We reject both of these contentions.

■■ Petitioner correctly observes that where one party fraudulently misrepresents a willingness to consummate the marriage, it will constitute ground for a declaration of invalidity. (*Louis v. Louis* (1970), 124 Ill. App. 2d 325, 260 N.E.2d 469.) This, however, is not such a case. Here, unlike *Louis*, there was no assertion of fact which could amount to a fraudulent representation. Respondent told petitioner the day before their marriage that she doubted whether she could fulfill his sexual desires. Petitioner, aware of this fact, nevertheless agreed to marry respondent upon the condition that she seek psychiatric help. Thus, the alleged misrepresentation amounts, at most, to an agreement to consummate the marriage sometime in the future. In this regard, an agreement to do something in the future is insufficient to constitute a fraudulent representation which would warrant invalidating the marriage. (*Louis v. Louis*.) Additionally, where both parties agree prior to marriage to not cohabit, the marriage will not be rendered void on the grounds that one party possessed a fraudulent intent to refuse intercourse. (See *de Vries v. de Vries* (1915), 195 Ill. App. 4.) We conclude that the facts presented in this appeal fail to establish fraud involving the essentials of the marriage, and we refuse to disturb the trial court's judgment on this basis.

■■ Additionally, we reject petitioner's contention that the trial court erred in finding that respondent's psychological incapacity to consummate the marriage was insufficient to warrant invalidating the marriage. Although there are few Illinois cases concerning sexual incapacity as grounds for an annulment of marriage, the historical and practice notes to section 301 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Ann. Stat., ch. 40, par. 301, Historical and Practice Notes, at 81-82 (Smith-Hurd 1980)) make reference to the issue. It is there stated that the majority of courts which have considered the question hold that a marriage may be held invalid based upon a spouse's psychological incapacity to consummate the marriage but only where the psychological impediment is shown to be incurable or permanent. (See Annot., 52 A.L.R.3d 589, 611-16 (1973).) Here, there was no showing that respondent's mental difficulties concerning sex were of a permanent nature. Instead, the evidence of respondent's psychiatrist, Dr. Corday, suggests that a cure was possible. Therefore, we conclude that the trial court did not err in refusing to invalidate the marriage on the basis of respondent's psychological incapacity to perform sexually.

Respondent's first contention on appeal is that the trial court's finding that she was guilty of extreme and repeated mental cruelty without provocation was against the manifest weight of the evidence. She argues that petitioner's testimony was too "vague and unspecific" to warrant the

trial court's determination to dissolve the marriage on the ground of mental cruelty. We reject this contention.

■■ Mental cruelty consists of acts which embarrass, humiliate, and cause anguish so as to render a spouse's life miserable or endanger his or her health. (*In re Marriage of Nilsson* (1980), 81 Ill. App. 3d 580, 402 N.E.2d 284; *West v. West* (1979), 77 Ill. App. 3d 828, 396 N.E.2d 1382.) Whether the acts charged amount to mental cruelty is primarily determined by the effect of the alleged misconduct upon the complaining party and in determining this effect the trial court may consider the emotional makeup of the parties and the circumstances under which the alleged misconduct occurred. (*In re Marriage of Semmler* (1980), 90 Ill. App. 3d 649, 413 N.E.2d 502; *In re Marriage of Nilsson.*) We believe that this determination is best left to the trial court. As was observed by the court in *Semmler*:

> "It appears from the nature of the misconduct relied on to prove mental cruelty, taken together with the requirement of proving the effect on the complaining party, that the trial judge's determination must necessarily be highly individualized and depend on the factual background of each case. The trial judge thus is in the best position to assess the credibility of the witnesses and the nature, weight and quality of the evidence in determining the issues of mental cruelty. [Citations.]" 90 Ill. App. 3d 649, 653, 413 N.E.2d 502, 506.

■■ In the instant case, petitioner testified that on a number of occasions he sought physical contact with respondent, who repeatedly rebuffed him. When petitioner sought to discuss respondent's sexual problem with her, she became belligerent and refused to speak with him. After a few weeks of marriage, respondent ceased preparing petitioner's meals and frequently stayed out late by herself. The tension caused by petitioner's marital conflicts affected him physically. He testified that respondent's conduct caused him to lose sleep, aggravated his hypertension, either caused or aggravated a heart condition, and interfered with his ability to function as a physician. The mere fact that respondent's testimony conflicted with petitioner's regarding certain particulars does not preclude a finding of mental cruelty. (See *Harry v. Harry* (1976), 38 Ill. App. 3d 776, 349 N.E.2d 69.) Therefore, we conclude that the trial court's finding regarding mental cruelty was not contrary to the manifest weight of the evidence.

■■ A related question is whether petitioner agreed to a sexless marriage and, consequently, is precluded from relying on respondent's conduct as a ground for dissolution by virtue of his consent to the injury complained of. (Ill. Rev. Stat. 1979, ch. 40, par. 408.) Again, the question is one of credibility. Petitioner expressly denied that he agreed to a marriage

without sex. Respondent, on the other hand, testified that such an arrangement was agreed upon prior to the marriage. It was well within the trial court's discretion to choose to believe petitioner, and we will not disturb that determination.

■■ Respondent attacks the trial court's finding that her mental condition, as evidenced by the deposition of Dr. Corday, would not preclude her from furthering her education or obtaining employment. We cannot agree with respondent's conclusion that the trial court's finding in this regard was against the manifest weight of the evidence. Dr. Corday described respondent's mental condition as a depressive neurosis which he treated solely by psychoanalysis, a lengthy form of treatment. Dr. Corday does not suggest that respondent's mental problem is so severe that she could not function in a learning or working environment. In fact, Dr. Corday stated that respondent's prognosis was good. We cannot say, based upon Dr. Corday's deposition, that respondent could not go to school or obtain employment because she lacked the mental capacity to do so.

■■ Respondent suggests that the trial court abused its discretion by ordering her to pay her own medical expenses. We disagree. None of respondent's medical problems appear to be of a permanent nature. Petitioner, who had already expended substantial sums in payment for respondent's past medical bills, was ordered to pay respondent over $4,000 in temporary maintenance and subsequently ordered to pay $16,000 maintenance in gross, $6,000 of which was payable within 14 days. Neither respondent's speculation that she may incur future medical bills nor her argument that she was not provided with sufficient funds to pay approximately $3,000 in outstanding medical charges justifies a conclusion that the trial court abused its discretion.

■■ It is alleged that the trial court committed error by refusing to award respondent her attorney fees. Here, respondent's counsel submitted only an itemized statement as proof of his fees. Petitioner's counsel objected to respondent's request for attorney fees based solely on counsel's statement and the objection was sustained. This was not error. It is well established that an award of attorney fees is improper where there is no evidence presented as to the reasonableness of the fees for such services. (*In re Marriage of Jacobson* (1980), 89 Ill. App. 3d 273, 411 N.E.2d 947.) Since petitioner's counsel objected to the method of proof regarding attorney fees and respondent's counsel refused to offer any additional evidence in support of the propriety of his fees, we find that the trial court did not abuse its discretion in denying respondent's petition for attorney fees.

■■ Respondent also attacks the trial court's finding that the antenuptial agreement entered into by her and petitioner was valid. She apparently argues that this finding was against the manifest weight of the evidence either because her testimony suggested that she signed the document

under duress or because the evidence established that the agreement was mutually rescinded. We reject both of these claims. There was testimony from both respondent and petitioner which indicated that respondent signed the agreement voluntarily after its provisions were explained to her. Respondent's testimony that she felt intimidated by the presence of bank officials and attorneys does not support her contention that she signed the agreement under duress. We are also not convinced that the agreement was mutually rescinded as respondent claims since the record presents no evidence to support this assertion.

Alternatively, respondent claims that since the antenuptial agreement did not provide for dissolution, a finding as to its validity was unnecessary, resulting in her being prejudiced in her related forcible entry and detainer action which has been consolidated in this appeal. We are of the opinion that respondent's speculation that in finding the antenuptial agreement valid the trial court somehow prejudiced her forcible entry and detainer action does not warrant disturbing the trial court's judgment. Respondent has failed to show any prejudice in this regard.

■■ Respondent claims for the first time on appeal that the trial court should have considered her alleged homestead right before finding that the O'Fallon residence was nonmarital property belonging to petitioner. We must reject this contention because respondent failed to assert her homestead claim in the trial court. The theory upon which respondent proceeded at trial was that the O'Fallon residence was marital property; the trial court properly ruled that since such property was acquired prior to the marriage, it constituted nonmarital property. (Ill. Rev. Stat. 1979, ch. 40, par. 503(a)(6).) It is impermissible for a party to proceed on one theory in the trial court and raise a new theory on appeal. (*In re Marriage of Melton* (1981), 93 Ill. App. 3d 338, 417 N.E.2d 220; *Schoenhard v. Schoenhard* (1979), 74 Ill. App. 3d 296, 392 N.E.2d 764.) We cannot allow respondent, who failed to assert her homestead claim to the trial court, to rely on the fact that such claim was not considered in order to reverse the trial court's judgment on appeal. Respondent's reliance on this court's opinion in *Klebba v. Klebba* (1969), 108 Ill. App. 2d 32, 246 N.E.2d 681, is misplaced. In *Klebba* the wife asserted her homestead claim before the trial court; on appeal we found the trial court's disposition of the matter erroneous. In this case, respondent never claimed a homestead right. We hold that since respondent failed to assert her alleged homestead right to the trial court, she cannot now claim that it was error for the trial court to have failed to rule upon it.

■■ Respondent claims that the trial court abused its discretion by failing to classify as either marital or nonmarital property the house located at 22 Chateau Drive in Belleville, Illinois, which petitioner purchased after he sold the O'Fallon residence. As respondent notes, the Belleville property

was purchased during the marriage and is presumed to be marital property. (Ill. Rev. Stat. 1979, ch. 40, par. 503(b).) It is equally correct, however, that this presumption may be overcome by evidence showing that the property was acquired "in exchange for property acquired before the marriage." (Ill. Rev. Stat. 1979, ch. 40, par. 503(a)(2).) The trial court held that the O'Fallon residence belonged to petitioner because it was purchased by him prior to marriage. Petitioner testified that he bought the house in Belleville about the same time he sold the O'Fallon residence. He purchased both properties with his own funds. At the time petitioner purchased the Belleville property, he was no longer living with respondent. Moreover, legal proceedings to terminate the marriage had already been filed at the time petitioner obtained the Belleville property. In light of these facts, we deem the presumption of marital property to have been rebutted and conclude that petitioner purchased his new residence in Belleville with his own nonmarital funds and, therefore, the latter property was nonmarital.

Respondent's contention that the trial court erred by failing to consider various portions of petitioner's income is without merit. The trial court specifically found that all assets relating to petitioner's medical practice were nonmarital property. This finding covered all income which respondent asserts was overlooked by the trial court.

■■ Next, we are confronted with the question of whether the trial court abused its discretion in making a rehabilitative maintenance award of $16,000 to the respondent. Respondent argues that the amount awarded to her is inadequate. We disagree. The short duration of the marriage, the relatively small contribution, if any, that respondent made to the marriage, and the fact that respondent is capable of supporting herself, lead us to conclude that the trial court did not abuse its discretion in making the maintenance award.

■■ We also reject respondent's contention that the trial court abused its discretion in ordering respondent to remove her personal property from storage. The trial court ordered that within 21 days respondent remove her personalty, which was taken from the O'Fallon residence by petitioner and placed in storage, or be liable for storage fees thereafter. Respondent did not comply with the order and now complains that she lacks the funds to remove her property from storage. According to the trial court's order, respondent could have avoided the payment of storage fees simply by removing her property within the 21-day period because it was not until after that time that petitioner was relieved of his responsibility to pay the storage fees. We find this order reasonable and not an abuse of discretion.

■■ Respondent further maintains that the trial court's finding that she had dissipated marital resources was against the manifest weight of the

evidence. The record establishes that respondent never contributed financially to the marriage in any way. Yet, she withdrew funds from a joint bank account and spent substantial sums of money during the brief course of the marriage. It was not erroneous for the trial court to find that respondent had dissipated marital resources.

■■ Finally, respondent argues that her lack of training and ill health preclude the trial court from concluding that she had a reasonable opportunity to acquire capital assets and income. We find that the trial court's conclusion was not against the manifest weight of the evidence. Respondent was young, had two years of college and stated that with the credits she had earned she could begin nursing school. Additionally, she had employment experience as both a legal receptionist and medical secretary. While respondent testified that she never received a high salary, the trial court could certainly conclude that respondent had a reasonable opportunity to acquire assets and income through either employment or further education. We are also convinced that respondent's health problems would not prevent this.

For the foregoing reasons, we conclude that the trial court committed no error in its conduct of the proceedings in Naguit v. Naguit, cause No. 81-75, and that the order of the court in such cause should be affirmed.

We next consider the issues raised by the appeal in Naguit v. Scrivner, cause No. 81-152, in which Mrs. Naguit appeals from an order granting summary judgment in favor of defendants in her forcible entry and detainer action. Two issues are raised by this appeal: (1) whether a triable issue of material fact existed precluding summary judgment and (2) whether the trial court committed reversible error by either rendering a judgment on the pleadings or improperly imposing an involuntary dismissal rather than summary judgment.

On September 23, 1980, Mrs. Naguit filed an action of forcible entry and detainer against defendants, who had purchased the O'Fallon residence from Dr. Naguit. Respondent's complaint alleged that she was entitled to possession of the O'Fallon residence by virtue of her homestead right. It is alleged that the O'Fallon residence was purchased by Dr. Naguit prior to his marriage to plaintiff and that title was taken in his name alone. It is further alleged that Dr. Naguit contracted to sell the premises to defendants on September 15, 1979, and executed a warranty deed in late October conveying the property to defendants. Dr. Naguit moved out of the O'Fallon residence in November, and plaintiff continued to live at the O'Fallon residence, but due to ill health she often resided at her mother's house in Buckner, Illinois. On December 5, 1979, after a three-day absence, plaintiff returned to the premises and discovered that defendants had taken possession of the property.

On January 22, 1981, the defendants moved for summary judgment,

alleging that no material questions of fact remained to be resolved because the judgment of dissolution of marriage rendered on January 19, 1981, found that the O'Fallon residence was not marital property and belonged solely to Dr. Naguit. After a hearing, the trial court entered an order granting defendant's motion for summary judgment which read in part:

> "The Court having considered the pleadings, the depositions and the exhibits that were offered and received, and takes judicial notice of the Judgment of Dissolution * * * entered on January 19, 1981 * * * IT IS HEREBY ORDERED that a summary judgment be entered in favor of the defendants and against the plaintiff.
>
> A forceable [sic] entry and detainer action is not the proper proceeding to determine the value of homestead right, or how far this right extends.
>
> The Court further finds that the issues in this case are moot when a Judgment of Dissolution of Marriage was entered on January 19, 1981."

Plaintiff has perfected this appeal and urges that a genuine issue of material fact existed concerning her right to possession, contending that she has an enforceable homestead right in the premises.

Summary judgment is proper when on the facts presented there is no triable issue. That is, when "there is no genuine issue as to any material fact * * * the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1979, ch. 110, par. 57(3).) As this court noted in *Bloomer Amusement Co. v. Eskenazi* (1979), 75 Ill. App. 3d 117, 118-19, 394 N.E.2d 16, 17:

> "A party is entitled to a summary judgment only if the pleadings, depositions, interrogatories, affidavits, exhibits and admissions in the record show that there is no genuine issue of material fact, and a summary judgment shall be denied if a fair-minded person can draw a different conclusion from the facts set forth in these documents."

■■ The purpose of a forcible entry and detainer proceeding is to determine which party has the right to possess the real estate. (*Daehler v. Oggoian* (1979), 72 Ill. App. 3d 360, 390 N.E.2d 417.) Where, as in the case at bar, an action for forcible entry and detainer is brought after a peaceable entry, the plaintiff must establish a right of possession. (*Graham v. Evischi* (1977), 50 Ill. App. 3d 268, 365 N.E.2d 162; 19 Ill. L. & Prac. *Forcible Entry* §4 (1956).) If the undisputed evidence establishes that no such right exists, then defendants would be entitled to summary judgment because their superior right to possession would be established. See *Kitzer v. Rice* (1967), 90 Ill. App. 2d 72, 234 N.E.2d 115.

1

■■■ When plaintiff remained in the residence after Dr. Naguit moved out, she would have been entitled to homestead only if Dr. Naguit had been guilty of deserting his family. (Ill. Rev. Stat. 1979, ch. 52, par. 2.) Further, when a divorce action has been litigated in the trial court and no disposition is made of the homestead estate in property, as the court is empowered to do under section 5 of the Homestead Act (Ill. Rev. Stat. 1979, ch. 52, par. 5), the right of the wife to homestead is terminated. (*Krusemark v. Stroh* (1943), 385 Ill. 64, 52 N.E.2d 156; *Claussen v. Claussen* (1917), 279 Ill. 99, 116 N.E. 693.) Thus, when the court failed to preserve the right of homestead in the plaintiff in the divorce decree, her right to hold the property as homestead was gone. (*Claussen v. Claussen; Krusemark v. Stroh.*) In the case at bar, defendants' motion and the attached judgment of dissolution of marriage establish that the plaintiff's right to homestead was terminated by reason of the fact that the trial court did not assign it to her in the dissolution of marriage proceeding. Since plaintiff's alleged entitlement to possession was based solely on her claim of homestead and this claim was terminated by the dissolution of her marriage to Dr. Naguit, defendants are entitled to summary judgment because no genuine issue of material fact existed.

The plaintiff further urges that the trial court committed reversible error by finding that a forcible entry and detainer action was not a proper proceeding to determine plaintiff's homestead rights and by also finding that the dissolution proceeding rendered the instant action moot. It is argued that such findings were actually judgments under either section 45 or 48 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, pars. 45 and 48) and did not constitute a finding that there was no issue of material fact, which is required before a motion for summary judgment may be allowed under section 57 of the Act (Ill. Rev. Stat. 1979, ch. 110, par. 57).

■■ Plaintiff's contention premised on section 45 ignores the fact that the trial court expressly stated in its order that it was rendering judgment based upon the pleadings, depositions and exhibits. This indicates a ruling on the evidentiary facts rather than a judgment on the pleadings. Additionally, assuming arguendo that there was some confusion between a judgment upon the pleadings and a judgment based upon the evidence, we find this insufficient to warrant a reversal of the trial court's judgment. While hybrid procedures which mix a section 45 motion regarding the pleadings and those concerning evidentiary matters under section 57 are improper and should be avoided, it does not follow that reversible error has occurred. (See *Janes v. First Federal Savings & Loan Association* (1974), 57 Ill. 2d 398, 312 N.E.2d 605.) The fact remains that plaintiff sought to assert a claim of homestead which no longer existed by reason of the fact that any homestead estate she had in the premises was extinguished when she ceased being the wife of Dr. Naguit and the

proceedings which dissolved the marriage did not assign such interest to her.

The plaintiff's alternative claim that the trial court erroneously rendered judgment under section 48 of the Civil Practice Act is also without merit since "matters covered by section 48 *de hors* the record may be reached by the summary judgment section." (Ill. Ann. Stat., ch. 110, par. 48, Historical and Practice Notes, at 355 (Smith-Hurd 1968).) This being the case, there can be no error in rendering summary judgment under section 57 rather than dismissing the action under section 48 based upon defendants' asserted defense that the dissolution of marriage proceeding defeated the plaintiff's claim.

For the reasons expressed above, the judgments of the circuit court of St. Clair County in both Nos. 81-75 and 81-152 are affirmed.

Affirmed.

KARNS, P. J., and JONES, J., concur.