*In re* MARRIAGE OF ROBERT A. HIRSCH, Petitioner-Appellant, and JU-DITH Y. HIRSCH, Respondent-Appellee.

First District (1st Division)   Nos. 83—1685, 83—2276, 84—218 cons.

Opinion filed August 12, 1985.—Rehearing denied September 25, 1985.

Ditkowsky & Contorer, of Chicago, for appellant.

Robert J. Weber, Ltd., and Alan L. Fulkerson, both of Chicago, for appellees Judith Y. Hirsch, Heritage Standard Bank & Trust Company, and Montgomery & Montgomery.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

In these three consolidated appeals, petitioner Robert A. Hirsch (Robert) seeks reversal of certain orders entered subsequent to the entry of a judgment of dissolution of marriage between him and respondent Judith Y. Hirsch (Judith). The orders now appealed from corrected the dissolution judgment *nunc pro tunc*, awarded attorney fees and costs to the attorneys representing the guardian of Judith's estate, required Robert to pay certain medical expenses incurred by Judith and awarded attorney fees and costs to Judith's court-appointed guardian *ad litem*. Additionally, Robert appeals the denial of his motion to quash certain citations to discover assets which were served on a brokerage firm and financial institutions where Robert maintained accounts. For the following reasons, we affirm in part, modify in part, and reverse in part.

The protracted litigation which has resulted in the present three appeals and a prior appeal to this court commenced on December 19, 1978, when Robert filed a petition to dissolve his 28-year marriage to Judith, alleging mental cruelty. During the following year, a settlement proposal was negotiated between Judith and Robert. However, in November 1979, Judith discharged her attorney and retained as her new counsel the law firm of Montgomery & Montgomery (the Montgomerys), who rejected the settlement proposal. Judith was subsequently hospitalized at Chicago Reed Mental Health Center in Chicago, as a result of a petition for involuntary judicial admission filed by her son, Harold Hirsch.

In the spring of 1980, the Montgomerys filed a petition in the pro-

bate court requesting that Judith be declared a disabled person and that the Heritage Standard Bank & Trust Company of Evergreen Park (Heritage Bank) be appointed the guardian of Judith's estate. The petition was granted, and Heritage Bank retained the Montgomerys to represent the bank in its capacity as guardian of Judith's estate. During the guardianship proceeding, attorney Robert J. Weber was appointed by the probate court to serve as Judith's guardian *ad litem*. On May 9, 1980, Weber was appointed Judith's guardian *ad litem* for purposes of the dissolution proceeding. Thereafter, on December 11, 1980, Weber filed an affirmative defense based on mental incompetency and a counterpetition for dissolution on behalf of Judith.

A detailed recitation of the testimony presented during the trial of the dissolution proceeding is not necessary for resolution of the issues presented in these appeals. It is sufficient to note that testifying on Judith's behalf were Dr. Robert Gross, a physician and neurologist, Dr. Charles Kitchen, a psychiatrist, and William McShane, a trust officer at Heritage Bank. McShane testified as to Judith's current economic condition. Judith's attorneys also called Robert as an adverse witness.

Robert offered the testimony of Dr. Dover Roth, a psychiatrist, to rebut the guardian *ad litem's* argument that Judith was not responsible for her actions during the marriage. He also called as a witness his accountant, Albert Sommers, who gave testimony pertaining to the identification of marital and nonmarital property, and Albert C. Balderman, vice president and trust officer of Heritage Bank, who testified as to assets of Judith in the bank's possession. Additionally, Robert testified on his own behalf as to the parties' property interests.

On January 7, 1982, the trial court issued an oral ruling as to most of the pending issues. In announcing its decision, the court struck the affirmative defense presented by the guardian *ad litem* and found that grounds for dissolution had been established. The court stated that the marital assets far exceeded $150,000 and, after considering both marital and nonmarital assets, the trial judge concluded, "I am going to give one hundred fifty thousand dollars ($150,000) to the Heritage Bank for the benefit of Judith Hirsch." The court also awarded Judith maintenance of $100 a week, barred Robert from maintenance, and ordered that Judith be named primary beneficiary of a $100,000 insurance policy on Robert's life. The court stated that it would reserve ruling on the matter concerning who would pay Judith's hospital bills. Counsel for both parties then indicated they

wished to file petitions for fees. Fee petitions were subsequently filed by the Montgomerys, the guardian *ad litem* and Robert's attorney.

On February 18, 1982, the trial court entered the written judgment for dissolution. The court, however, reserved the issues of attorney fees, liability for Judith's medical bills and the division of approximately $8,500 in the parties' joint escrow account at First Federal Savings & Loan Association of Chicago.[1] On February 26, 1982, a petition for payment of certain costs and medical expenses was filed on Judith's behalf.

On March 25, 1982, Heritage Bank, as guardian of Judith's estate, filed a petition for rule to show cause as to why Robert should not be held in contempt for failure to comply with the judgment of dissolution of February 18, 1982, requiring him to pay $150,000 in cash to Heritage for the benefit of Judith. At a hearing on the petition for rule to show cause on May 21, 1982, Robert maintained that he was entitled to an offset against the $150,000 he was required to pay under the judgment of dissolution; the asserted offset represented Judith's existing funds in the Heritage account.[2] The trial court stated that it did not agree with Robert's interpretation of the judgment and, to be sure there was no misunderstanding, the court on May 21, 1982, ordered a correction *nunc pro tunc*. The *nunc pro tunc* order provided that Robert pay $150,000 in cash by July 21, 1982, and continued other matters including the petitions for attorney fees and costs and the disposition of the escrowed funds.

Robert appealed from the May 21, 1982, order (Docket No. 82—1681). On June 13, 1983, this court dismissed the appeal as premature in an unpublished order pursuant to Supreme Court Rule 23 (87 Ill. 2d R. 23). (*In re Marriage of Hirsch* (1983), 114 Ill. App. 3d 1151 (Rule 23 order).) We reasoned that since ancillary issues remained pending in the trial court, the dissolution was not final and the appeal therefore could not be maintained under *In re Marriage of Leopando* (1983), 96 Ill. 2d 114, 449 N.E.2d 137.

During the pendency of the above appeal, the trial court considered the issues reserved by the February 18, 1982, judgment of disso-

---

[1]The account was created after the parties' marital residence was sold, netting them $113,000. The trial court previously had ordered that $100,000 of this amount be divided between Robert and Judith, that a portion be used to pay certain bills, and that the balance be deposited into a joint escrow account at First Federal Savings and Loan Association of Chicago.

[2]The funds in the heritage account, according to Robert, consist of Judith's share of the proceeds from the sale of the marital home and certain stocks and bonds that were turned over to her after she was adjudicated disabled.

lution. The court first considered the petitions for attorney fees submitted by the Montgomerys. The Montgomerys twice amended their fee petition. Their first amended fee petition sought in excess of $70,000 for a total of 652.5 hours, while their second amended petition sought $39,831, for a total of 372.50 hours. Both petitions sought hourly rates of $125 for court time and $100 for office time.

Robert and the guardian *ad litem* filed objections to the fee petition, and the court therefore conducted an evidentiary hearing on the petition at which Walter Montgomery and his son, Lee, testified. Walter Montgomery testified that he and his son conduct a general neighborhood practice in Chicago. During the 46 years he has practiced law, he has tried approximately 75 contested divorce cases. He stated that his firm did not keep contemporaneous records of the time spent in this case but instead reconstructed their time by reviewing their files and the fee petitions of other attorneys in this case. Lee Montgomery testified that he has practiced law since 1973 and has tried nearly 100 cases to judgment or verdict. Five to ten of those cases were contested divorces.

On June 16, 1983, the trial court entered a written order awarding the Montgomerys costs of $1,702 and fees of $30,519 as compensation for all of the 372.5 hours listed on the second amended fee petition. The fee award was based upon an hourly rate of $100 for court time and $75 for office time. The court ordered that the fees and costs be paid in the following manner: (1) $8,559 from the balance of the parties' joint escrow account; (2) $16,564 (70% of balance) from Robert; and (3) $7,099 (30% of balance) from Heritage Bank as guardian of Judith's estate. On July 12, 1983, Robert filed an appeal from the June 16 order (Docket No. 83—1685).

Subsequently, on September 1, 1983, the guardian *ad litem* presented a motion to resolve all pending matters, including his petition for fees and the unpaid medical bills. Over Robert's objection, the guardian *ad litem* submitted and testified as to five unpaid bills totalling $11,835 for medical services rendered to Judith prior to the entry of the judgment for dissolution. The guardian *ad litem* further noted that proceeds from two insurance policies totalled $4,800. Applying that credit to the total of the outstanding bills there remained an unpaid balance of $7,035. On September 13, 1983, the court entered an order requiring Robert to pay $7,035 to Heritage Bank to satisfy the unpaid medical bills.

Also on September 13, 1983, the trial court entered an order awarding the guardian *ad litem* fees and costs in the amount of $9,300. The order required Robert to pay $7,440 of the award, with

the remaining $1,860 to be paid by Heritage Bank, as guardian of Judith's estate. The two orders of September 13 resolved all of the remaining issues in the case.

On September 19, 1983, Robert filed a notice of appeal from both orders of September 13, 1983, the *nunc pro tunc* order of May 21, 1982, and the order of June 16, 1983, awarding fees and costs to the Montgomerys (Docket No. 83—2276). Robert did not file a petition to stay enforcement of the orders appealed from nor seek leave to file an appeal bond. Consequently, on December 12, 1983, citations to discover assets were filed. Robert moved to quash the citations. On January 12, 1984, after hearing arguments, the trial court denied the motion to quash, and ordered that certain assets belonging to Robert and being held by a brokerage house and financial institution be turned over to satisfy the judgments rendered in the instant case. Robert appealed the order (Docket No. 84—218). His motion to consolidate the three appeals was granted by this court.

## I

In the first of the three consolidated appeals (Docket No. 83—1685), Robert challenges the order of June 16, 1983, awarding fees and costs to the Montgomerys. This appeal must be dismissed because Robert filed his notice of appeal on July 12, 1983, which was prior to the time that the ancillary issues involving Judith's medical expenses and guardian *ad litem* fees were resolved on September 13, 1983. Until that time, the case was not finally adjudicated and the appeal in question could not be taken. (*In re Marriage of Leopando* (1983), 96 Ill. 2d 114, 449 N.E.2d 137.) This result is unchanged by the fact that the order in question contained a recital that there was no just reason for delay or enforcement of this appeal. 96 Ill. 2d 114, 120.

The record shows, however, that Robert did properly raise the issue of the Montgomerys' fee award in his notice of appeal for his second appeal (Docket No. 83—2276), which was timely filed within 30 days of the final adjudication of this case. Consequently, this issue is properly before this court as apart of the second appeal and will be discussed below.

## II

In his second appeal (Docket No. 83—2276), Robert challenges the following orders: (1) the *nunc pro tunc* order of May 21, 1982; (2) the order of June 16, 1983, awarding attorney fees to the Montgomerys; (3) the order of September 13, 1983, requiring him to pay medical expenses incurred by Judith; and (4) the order of September 13, 1983,

awarding attorney fees to the guardian *ad litem*.

## A

We turn first to Robert's arguments pertaining to the *nunc pro tunc* order. The order was entered to correct the February 18, 1982, judgment of dissolution which was drafted by Robert's attorney and provides, in pertinent part, as follows:

"5. That the marital assets of the parties exceed $150,000.00, and petitioner ROBERT A. HIRSCH has been very, very careful to keep all the assets which were inherited through three different estates separate and apart. He sequestered them unto himself and has insisted all of them were non-marital; however, there has been some flowing over from the non-marital into the marital during different transactions.

6. That JULO [JUDITH] Y. HIRSCH has assets in the Heritage Standard Bank which are approximately $65,000.00.

NOW THEREFORE, IT IS ORDERED AS FOLLOWS:

* * *

2. That of the marital assets of the parties hereto, the Heritage Standard Bank, for the use and benefit of JULO [JUDITH] Y. HIRSCH as guardian of her disabled person's estate is awarded one hundred fifty thousand dollars ($150,000) of the said assets as delineated in the evidence presented by the parties hereto in their respective proofs. Mr. Hirsch's payment to be in cash."

On March 25, 1982, Heritage Bank, as guardian of Judith's estate, filed a petition for rule to show cause against Robert as to why he should not be held in contempt for failure to comply with the judgment. At a hearing on the petition, Robert asserted he did not owe an additional $150,000, but was entitled to a setoff consisting of those funds already in Judith's account at Heritage Bank. As a result of this setoff, Robert contended he was required to pay only $74,778 to Heritage. The trial court stated that it disagreed with Robert's interpretation of the judgment and, to ensure there was no misunderstanding, the court entered a *nunc pro tunc* order on May 21, 1982, which provided:

"1. Robert A. Hirsch shall pay $150,000 in cash ('the award') to Judy Y. Hirsch, a disabled person, by making payment of the Award to the Heritage Standard Bank and Trust Co. of Evergreen Park, Illinois ('the Guardian'), guardian of the estate of Judy Y. Hirsch, said Award to be in addition to any funds or other property now held by said Guardian;

2. Payment of said Award shall be made at Evergreen Park, Illinois on or before July 21, 1982."

Robert argues that the *nunc pro tunc* order is void because his property rights became vested at the time the dissolution judgment was entered on February 18, 1982, and that the trial court therefore lacked jurisdiction to modify those rights more than 30 days thereafter. We must reject this argument.

■■ A trial court has authority to enter a *nunc pro tunc* order at any time to correct a written record of a judgment so that it conforms with the judgment in fact rendered by the court. (*In re Marriage of La Reno* (1980), 113 Ill. App. 3d 755, 447 N.E.2d 949; *Dauderman v. Dauderman* (1970), 130 Ill. App. 2d 807, 263 N.E.2d 708.) This inherent authority rests partly upon the right and duty of the courts to do entire justice to every suitor, and partly upon their control over their own records and their authority to make them speak the truth. (*Kooyenga v. Hertz Equipment Rentals, Inc.* (1979), 79 Ill. App. 3d 1051, 1056, 399 N.E.2d 216.) The correction must be based on some note, memorandum or memorial paper remaining in the file or upon the records of the court; it cannot be based on the recollection of the trial judge or other persons. (*In re Marriage of La Reno* (1980), 113 Ill. App. 3d 755, 447 N.E.2d 949.) The power is limited to entering into the record something which was actually done; the alleged error sought to be corrected must be clerical and not judicial. The distinction between a clerical error and a judicial one depends not so much upon the *source* of the error but upon whether it was the deliberate result of judicial reasoning and determination. *Dauderman v. Dauderman* (1970), 130 Ill. App. 2d 807, 263 N.E.2d 708.

■■ Applying these principles to the case before us, we find that the trial court acted within its authority in entering the *nunc pro tunc* order. The present case does not involve an error which was the deliberate result of judicial reasoning and determination. Rather, the court was merely clarifying the February 18, 1982, judgment of dissolution so that it accurately reflected the judgment in fact rendered. The record reveals that in announcing its oral ruling on January 7, 1982, the court asked counsel for Robert how much money currently existed in Judith's account at Heritage Bank, and he replied, "$65,000." The court stated, "[A]nd I think the marital assets over and above that, far exceeds one hundred fifty thousand dollars ($150,000)." The court then concluded: "I am going to give one hundred fifty thousand dollars ($150,000) to the Heritage Bank for the benefit of Judith Hirsch." Robert's attorney then asked the court, "After he pays $150,000 to

the Heritage Bank, everything else belongs to him?" The court answered affirmatively. On February 18, 1982, in response to questioning immediately prior to the entry of the written judgment, the court again reaffirmed that Robert was to put $150,000 *in cash* into Heritage Bank.

■ Robert argues that the trial court had no authority to act *nunc pro tunc* absent a petition requesting such relief, and should not have acted *sua sponte* on its own motion. The record indicates, however, that the court did not act on its own motion but instead entered the *nunc pro tunc* order pursuant to a written recommendation presented by the guardian *ad litem* at the rule to show cause hearing. In any event, there is nothing to preclude the court from acting *sua sponte* since a *nunc pro tunc* order is based on the inherent power of the court to correct its own records. Such orders can be entered at any time with notice to the parties. (*Dauderman v. Dauderman* (1970), 130 Ill. App. 2d 807, 263 N.E.2d 708.) Here, Robert had notice of the *nunc pro tunc* order and had adequate opportunity to argue in support of his position prior to its entry.

■ Without citing any authority, Robert next urges that the *nunc pro tunc* order is invalid because it fails to specify the date it relates back to. We disagree. *"Nunc pro tunc"* literally means "now for then." (Black's Law Dictionary 964 (5th ed. 1979).) A *nunc pro tunc* order is an entry now for something previously done, made to make the record speak now for what was actually done then. (*Kooyenga v. Hertz Equipment Rentals, Inc.* (1979), 79 Ill. App. 3d 1051, 399 N.E.2d 216.) The *nunc pro tunc* order in this case corrected the judgment of February 18, 1982, and therefore relates back to that date.

■ Finally, we must reject Robert's argument that the trial court, in acting *nunc pro tunc*, impermissibly relied on its own recollection, rather than on any written memoranda or court records. As we specifically noted in our Rule 23 order, the trial court reviewed the transcript of the proceedings prior to making the correction. Accordingly, the *nunc pro tunc* order of May 21, 1982, is affirmed.

### B

■ We next address Robert's objections concerning the fees awarded to the Montgomerys, who represented Heritage Bank in this case. Robert first suggests that Judith's adjudication as a disabled person required the probate court to adjudicate the Montgomerys' fee petition. We do not agree.

The law in Illinois is well settled that

"attorney fees and the ordinary expenses and burdens of litiga-

tion *are not allowable* \*\*\* in the absence of a statute, or in the absence of some agreement or stipulation specifically authorizing the allowance thereof \*\*\*." (Emphasis added.) (*Ritter v. Ritter* (1943), 381 Ill. 549, 553, 46 N.E.2d 41.)

There is nothing in the Probate Act (Ill. Rev. Stat. 1983, ch. 110½, par. 1—1 *et seq.*) which confers authority upon that court to assess fees incurred on behalf of a disabled person during a dissolution proceeding with a former spouse. Moreover, the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1983, ch. 40, par. 101 *et seq.*) contains no language limiting the trial court's authority to award attorney fees when presented with a proper fee petition.

We note that the probate court had no familiarity with the parties' relative financial positions and their ability to earn future income. Those issues would need to be retried if the fee petition was heard by the probate court. Hence, Robert's suggestion is not only without authority, but also flies in the face of judicial economy.

■ Robert next argues that the $30,519 in fees awarded to the Montgomerys was excessive. We agree. The Illinois Marriage and Dissolution of Marriage Act provides that the trial court may order either spouse to pay a reasonable amount for costs and attorney fees "necessarily incurred." (Ill. Rev. Stat. 1983, ch. 40, par. 508(a).) In determining the fee award, the trial court is to consider the following factors: the importance, novelty and difficulty of the questions raised, the degree of responsibility of the attorney, the time and labor required, the benefits resulting to the client, the skill and standing of the attorneys employed, the usual and customary charge in the community and the financial position of the parties. (*In re Marriage of McNeeley* (1983), 117 Ill. App. 3d 320, 453 N.E.2d 748.) While the allowance of attorney fees in dissolution proceedings rests within the sound discretion of the trial court and the exercise thereof will not be interfered with unless such discretion is clearly abused, a court of review will not hesitate to reduce an unreasonably high award. *In re Marriage of Brophy* (1981), 96 Ill. App. 3d 1108, 1117, 421 N.E.2d 1308.

Application of the foregoing principles to the present case indicates that the fee award is unreasonably high. While the litigation was lengthy, the Montgomerys were not required to handle any issues which were novel or complex from a family law viewpoint. (*In re Marriage of Dulyn* (1980), 89 Ill. App. 3d 304, 411 N.E.2d 988.) The questions at issue in this case were, for the most part, routine. The only rather unusual issue pertained to Judith's disability. This matter, however, was handled primarily by Judith's guardian *ad litem*, Robert

Weber, who was an active litigator in this case and assumed a large degree of responsibility on Judith's behalf. It was Weber who prepared Judith's affirmative defense of mental incompetency and interviewed both the neurologist and psychiatrist who later testified on Judith's behalf. Weber organized Judith's medical bills and presented them to the court when it became apparent that the Montgomerys were unable to do so. It was also Weber's efforts that led to the entry of the *nunc pro tunc* order.

The Montgomerys urge that the instant case was complicated because they were required to determine whether Robert commingled funds which he received from three substantial inheritances. They assert that a significant amount of their time was spent attempting to discover whether he had commingled those assets, verify their status as marital or nonmarital property and value them. While the Montgomerys may have devoted many hours to discovery, they must show that their efforts were necessary and beneficial; this court has made it clear that something more must be shown to justify an award of fees then merely a compilation of an hourly rate. (*In re Marriage of Rizzo* (1981), 95 Ill. App. 3d 636, 420 N.E.2d 555; *In re Marriage of Pedersen* (1979), 77 Ill. App. 3d 716, 396 N.E.2d 659.) Here, the Montgomerys have identified few positive results from their discovery efforts. As guardian *ad litem*, Weber even noted in his written objections to the fee petition that there was a lack of organization and follow-up on the part of the Montgomerys with respect to discovery. At trial, the Montgomerys produced very little evidence as to property division. They presented no accountant to testify as to the property designations or commingling of funds. They traced no assets, nor presented any testimony to contradict Robert's testimony. At the hearing on the fee petition, Walter Montgomery was unable to recall how the discovery was reflected, or assisted him, in his closing argument.

We next consider the overall amount of time and labor spent in this case. The Montgomerys admitted they did not keep contemporaneous records of their time, but instead reconstructed their time by examining their files and the time records of other attorneys in this case. While such reconstructions can be considered by the court, they are "clearly more susceptible to error" and, therefore, "more suspect than more properly maintained time records." (*Gasperini v. Gasperini* (1978), 57 Ill. App. 3d 578, 584-85, 373 N.E.2d 576.) The reconstruction in the present case is particularly suspect in view of the wide disparity between the different fee petitions submitted by the Montgomerys. Their first amended fee petition, which was verified, sought fees in excess of $70,000 for 652.5 hours of work. They then

withdrew this fee petition and filed another sworn fee petition in which the number of hours claimed was almost cut in half. The second amended fee petition sought approximately $39,000 for 372.50 hours of work.

Moreover, while Walter and Lee Montgomery testified they each worked on this case, the fee petition makes it appear as if only one attorney performed all of the listed tasks. The petition omits to specify whether each task was performed by Walter or Lee. Such an omission tends to cast further suspicion on the accuracy of their time reconstruction.

With regard to the 269.25 hours of office time listed on the second amended fee petition, most of the items of office time must be seriously questioned as being reasonable and necessary. For example, the fee petition claims, in two different places, approximately one hour on the same date (September 15, 1980) to review petitioner's motion to quash. The petition lists 7.75 hours and 2.75 hours for "document review," with no further explanation. The petition claims two hours to review petitioner's motion for summary judgment and motion *in limine,* and four hours to prepare a simple notice of deposition and notice to produce. There are also numerous claims of 30 minutes and 45 minutes to review only one letter. There was no showing in the petition or at the hearing that these expenditures and many other substantial time expenditures claimed for routine tasks were necessary or reasonable.

The next factor we must weigh is the benefit resulting to Judith. We note that before the Montgomerys entered this case, Judith's prior attorney reached a settlement agreement with Robert which is part of the record before us. The settlement agreement, which later was rejected by the Montgomerys, provided that Robert pay $225,000 into a trust created for Judith, with the parties' eldest son serving as trustee. In addition to Judith receiving income generated from the trust fund, the agreement authorized the trustee to invade the principal to provide funds necessary for Judith's "reasonable support in the style of living to which she has been accustomed."

It is our conclusion that the Montgomerys did not obtain any significant benefits for Judith beyond what she would have received under the settlement proposal. In fact, the corpus of the trust provided for in the proposed settlement exceeded the property awarded Judith in the dissolution proceeding. At the hearing on their fee petition, Walter and Lee Montgomery were questioned as to how the outcome of this lengthy litigation differs from the settlement agreement. The only accurate distinction they mentioned pertained to the disposition

of property upon Judith's death. Under the settlement agreement, Judith was prohibited from making any testamentary disposition of the trust principal; upon her death, all trust principal would have been distributed to the parties' two sons. Under the dissolution judgment, no such restriction exists. In our opinion, it is doubtful whether this benefit justifies the additional years and costs of litigation. Moreover, during the time this case was litigated, the trust fund could have earned more than $80,000 in interest.[3] Now, we note, Judith's estate will be diminished by the ongoing payment of administrative fees and costs to Heritage Bank, who in dissatisfaction with the representation by the Montgomerys hired additional counsel to help bring this case to a conclusion.

For the above reasons, we conclude that the fee award to the Montgomerys must be reduced. Rather than prolonging this already lengthy litigation by remanding this cause to the trial court for a recomputation of the fee award, we will reduce the award pursuant to our authority to do so. (87 Ill. 2d R. 366(a)(5); *In re Marriage of Rizzo* (1981), 95 Ill. App. 3d 636, 652, 420 N.E.2d 555.) Based on the record before us, we find that an award of $7,500 for the Montgomerys' fees is adequate, and we hereby reduce the award to that amount. The reduced award of $7,500, plus costs of $1,702, is to be paid from the $8,559 in the parties' joint escrow account which was one of the sources designated by the trial court in its order of June 16, 1983. The balance of the fee award is to be paid by Robert.

C

Robert seeks reversal of the order of September 13, 1983, awarding attorney fees and costs to attorney Robert Weber, the guardian *ad litem*. Weber submitted two fee petitions in the dissolution proceeding, each covering different time periods and accompanied by a detailed time sheet. In June 1982, the trial court awarded Weber fees and costs of $11,950 on his first petition, which claimed 119.5 hours of work performed from May 15, 1980, through January 7, 1982. On September 13, 1983, the court awarded Weber fees and costs of $9,300 on his second petition, which claimed 95.5 hours of work performed from January 18, 1982, through April 26, 1983. Weber addi-

---

[3]In their "Reply Memorandum in Support of the Petition of Montgomery & Montgomery for Attorney's Fees and Costs," the Montgomerys note that under the dissolution judgment Judith has an irrevocable right to a $100,000 insurance policy on Robert's life. We believe this benefit is cancelled out by the substantial interest the trust could have earned during the course of the litigation and by the additional fees and costs generated by the lawsuit.

tionally was awarded $350 by the probate court for services he rendered in the guardianship proceedings.

■ Robert now challenges only the second fee award, raising three objections in his brief. First, he argues that the guardian *ad litem* is entitled to a fee either as the guardian *ad litem* or as an attorney, but not both. He cites no authority which supports such a proposition. Section 11a—18 of the Probate Act of 1975 (Ill. Rev. Stat. 1983, ch. 110½, par. 11a—18) describes the duties of the guardian of the estate of a disabled person. Subsection (c) of this statute specifically provides:

> "The guardian of the estate of a ward shall appear for and represent the ward in all legal proceedings unless another person is appointed for that purpose as guardian or next friend. This does not impair the power of any court to appoint a guardian ad litem or next friend to defend the interests of the ward in that court, or to appoint or allow any person as the next friend of a ward to commence, prosecute or defend any proceeding in his behalf."

Hence, under section 11a—18, it is clear that in addition to the guardian of the estate (in this case, Heritage Bank), there may be a second party, namely the guardian *ad litem*, to represent the interests of the disabled person. The guardian *ad litem* is specifically authorized "to defend the interests of the ward in that court." A defense in court necessarily entails legal representation. It was therefore proper in this case to award attorney fees to the guardian *ad litem*.

■ Robert next contends that the guardian *ad litem* billed twice for the same services in his two fee petitions. He has failed, however, to point out one billing item which is common to both fee petitions. Rather, he notes only that the order of September 13, 1983, specifies that the fee award is for the period of May 1980 to January 1982, which happens to be the same period of time listed in the guardian *ad litem's* first fee petition for which he was awarded fees in June 1982. After reviewing the record of proceedings, however, it is obvious that the trial court's order of September 13, 1983, was intended to compensate the guardian *ad litem* for the period of time set forth in his second fee petition—January 18, 1982, through April 26, 1983. Common sense dictates that this court not set aside the fee award on this ground.

■ Robert's third objection is that the guardian *ad litem* unnecessarily duplicated the services of the Montgomerys. He presents no evidence to substantiate this allegation. We have reviewed the guardian *ad litem's* second fee petition and find no unnecessary duplication

of effort on his part. We note that the vast majority of hours claimed in his second fee petition stemmed from Robert's initial appeal, which was dismissed. The Montgomerys, in their fee petition, claimed no time for working on that appeal. Moreover, the responsibility undertaken by the guardian *ad litem* has been given due consideration by this court and was a significant factor in our decision to reduce the Montgomerys' fee award.

Briefly, we note that at oral argument before this court, counsel for Robert argued that the order requiring him to pay the guardian *ad litem's* fees must be set aside because the court made no specific finding that Judith was unable to pay the fees. Counsel for Judith replied, and we agree, that this issue was not raised below or in Robert's brief and is therefore waived on appeal. (*Uhwat v. Country Mutual Insurance Co.* (1984), 125 Ill. App. 3d 295, 465 N.E.2d 964.) Accordingly, the order awarding fees to the guardian *ad litem* is affirmed.

### D

■■ We next address Robert's objections to the order of September 13, 1983, requiring him to pay Heritage Bank $7,035 for Judith's outstanding medical bills. Robert first suggests that if any sums were to be awarded for medical expenses, the determination should have been made prior to February 18, 1982, when the judgment for dissolution was entered. He maintains that the dissolution judgment was final, and that the September order therefore impermissibly modified that judgment. This argument must fail. The trial court specifically reserved the issue of payment of Judith's medical expenses in the judgment for dissolution entered on February 18, 1982. There is no indication from the record before us that Robert objected to the reservation of the issue at that time. Moreover, in our Rule 23 order dismissing Robert's initial appeal, this court recognized that the trial court reserved consideration of the medical bills and other ancillary issues, and it was for this precise reason that we dismissed the appeal as premature. *In re Marriage of Leopando* (1983), 96 Ill. 2d 114, 449 N.E.2d 137.

■■ Robert also urges that the medical bills should have been submitted to the probate court as part of the guardianship proceeding. He cites no authority which precludes this issue from being resolved in the dissolution proceeding. Nor does he dispute that these bills were incurred during the marriage and thus were a "debt" of the marriage. As such, we cannot conclude it was error for this issue to be resolved in the dissolution proceeding.

■■■ Lastly, Robert asserts that there was no competent evidence to support the order directing payment of the medical bills. The record reveals that at an evidentiary hearing on the matter on December 21, 1982, William McShane, a trust officer at Heritage Bank, testified as to some of the outstanding bills, including portions of a $7,864 bill from Northwestern Memorial Hospital. Questions were raised as to available insurance proceeds and the hearing was continued until September 1, 1983. On that date, the guardian *ad litem* identified and presented the balance of the medical bills and testified regarding the insurance proceeds received from two policies in the amount of $4,800.

Robert now complains that he "was never given an opportunity to finish his cross-examination or to present evidence in opposition to whatever evidence the respondent presented." However, we have reviewed the transcript of proceedings from September 1, 1983, and find that Robert failed to ask the court for any additional time to finish his cross-examination, present his own evidence or examine the bills.

Payment of the medical bills rested within the sound discretion of the trial court. (*In re Marriage of Naguit* (1982), 104 Ill. App. 3d 709, 722, 433 N.E.2d 296.) Robert has offered nothing except for his posturing about the finality of the February 18, 1982, judgment, discussed above, that would suggest that the bills in question were not his responsibility. We therefore cannot conclude that the trial court abused its discretion in holding Robert responsible for the bills. However, rather than requiring Robert to pay Heritage Bank the outstanding balance of the bills, we hereby modify the order to require Robert to hold Judith and Heritage Bank harmless to the extent of Judith's liability on the outstanding medical bills submitted to the court. This modification allows Robert to further challenge the sums purportedly due and owing.

## III

■■■ In his third appeal (Docket No. 84—218), Robert seeks reversal of the order of January 12, 1984, denying his motion to quash citations to discover assets. The order, which was entered following a hearing on that same date, provides: (1) that Robert appear for a citation examination; (2) that a rule to show cause be entered against First National Bank of Highland Park and the Bank of Northfield for their failure to comply with the citations served upon them; and (3) that Merrill, Lynch, Pierce, Fenner & Smith, Inc., and First Federal Savings & Loan turn over certain assets to satisfy the orders of May

21, 1982, and June 16, 1983, and the September 13, 1983, order regarding Judith's medical expenses. The September 13, 1983, order concerning the guardian *ad litem's* fees was not part of the citation proceedings.

Initially, we observe that in his briefs for this appeal, Robert devotes much time to arguing about the validity of the above mentioned orders. The question of whether or not these orders were valid was resolved under Docket No. 83—2276 and is not an issue in this appeal.

Turning to the merits of this third appeal, Robert asserts that at the citation hearing the trial court directed him to appear for a citation examination even though he allegedly had not been served with notice of the citation. The record of proceedings, however, reveals that Robert was present in open court with his attorney at the January 12, 1984, citation hearing. At no time was any objection made as to the court's jurisdiction over him. As such, a jurisdictional challenge at this time must fail.

Robert also argues that the May 21, 1982, order was "not appropriate for collection" by citation because it is merely a "personal direction" and not an enforceable judgment. Such an argument is baseless. The authorities cited by Robert do not support his position. As established previously herein, the order of May 21, 1982, was properly entered to correct the judgment for dissolution and thus was incorporated as part of that judgment. The order was appropriate for collection by citation proceedings since the proceedings were not initiated until December 14, 1983, more than two months after the date when the dissolution action became finally adjudicated.

■ We must further reject Robert's claim that the trial court acted in violation of Supreme Court Rule 305(a)(1), which provides:

"An appeal stays the enforcement of a judgment for money only if a notice of appeal is filed within 30 days after the entry of the judgment appealed from and a bond in a reasonable amount to secure the appellee is presented, approved, and filed within the same 30 days or within any extension of time granted under subparagraph (2) of this paragraph. Notice of the presentment of the bond shall be given to the appellee." 87 Ill. 2d R. 305(a).

In the case at bar, the judgment for money became final and appealable on September 13, 1983. (*In re Marriage of Leopando* (1983), 96 Ill. 2d 114, 449 N.E.2d 137.) Although Robert timely filed his notice of appeal within 30 days of that date, he never petitioned the trial court for a stay of enforcement of the orders or requested that a bond be posted to stay the proceedings pursuant to Rule 305(a). Nor

did he petition the trial court for an extension of time in which to post the bond or stay enforcement of the proceedings. (87 Ill. 2d R. 305(a).) Consequently, on December 12, 1983, appellees filed their citation proceedings pursuant to section 2—1402(a) of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1402(a)).[4]

Although Robert moved to quash the citations, he failed to make any motion to stay the proceedings. It was not until after the citation hearing and after the order denying his motion to quash the citations that Robert filed his motion for an order of protection in this court. On February 6, 1984, this court entered an order staying the proceedings and requiring Robert to post a bond in the amount of $50,000 within 15 days. (87 Ill. 2d R. 305(b)(2).) Robert thereafter filed a $50,000 bond on February 17, 1983, within the 15-day time period. Without citing to the record, Robert alleges in his "Statement of Facts" that on February 7, 1984, the day after the stay had been granted, the Bank of Northfield ignored the stay order and paid over to the Montgomerys more than $55,124. After examining the record before us, we have found no evidence to support such an assertion. Without adequate support in the record, an allegation included in the statement of facts contained in an appellant brief lies outside the record and may not be considered on appeal.[5] *Paine, Webber, Jackson & Curtis, Inc. v. Rongren* (1984), 127 Ill. App. 3d 85, 468 N.E.2d 459.

Robert asserts in his reply brief that "the filing of the 'stay bond' *nunc pro tunc* to the date of the filing of the notice of appeal stayed all proceedings." He fails to identify which notice of appeal he is referring to. In any event, the records of this court do not indicate that the stay bond was filed *nunc pro tunc*.

---

[4]Section 2—1402(a) provides, in relevant part:

"A judgment creditor, or his or her successor in interest when that interest is made to appear of record, is entitled to prosecute supplementary proceedings for the purposes of examining the judgment debtor or any other person to discover assets or income of the debtor not exempt from the enforcement of the judgment therefrom, a deduction order or garnishment, and of compelling the application of non-exempt assets or income discovered toward the payment of the amount due under the judgment." Ill. Rev. Stat. 1983, ch. 110, par. 2—1402(a).

[5]The record contains a partial release and satisfaction of judgment filed by Heritage Bank, as guardian of Judith's estate, on February 15, 1984. This document discloses that Heritage Bank received $55,125 from the Bank of Northfield on February 3, 1984, which was prior to the effective date of the stay. Given that Robert has failed to provide this court with any contrary evidence, we must assume that this date, rather than the date urged by him, is correct.

■■■ ■ Robert also argues that his constitutional rights were violated during the citation proceedings. He failed, however, to raise this issue in the proceedings below and it is therefore waived on review. (*People ex rel. Hartigan v. National Anti-Drug Coalition* (1984), 124 Ill. App. 3d 269, 464 N.E.2d 690.) Moreover, in setting forth this argument, Robert relies on a report of the proceedings of February 1, 1984, which he attached to his appellant brief. The report, which is uncertified, was never made part of the record before us and thus is not properly before this court. *Regal Package Liquor, Inc. v. J.R.D., Inc.* (1984), 125 Ill. App. 3d 689, 466 N.E.2d 409.

■■■ Finally, Robert objects to the calculation of interest on the judgments. This argument was not raised in the proceedings below but is being advanced for the first time on appeal. Accordingly, the issue is now waived for our review. *Gibson v. State Farm Mutual Automobile Insurance Co.* (1984), 125 Ill. App. 3d 142, 465 N.E.2d 689.

■■■ Finally, we must comment on the fact that the briefs submitted by Robert fail to comply with Supreme Court Rule 342(a) (87 Ill. 2d R. 342(a)), which governs the form and contents of an appendix to an appellant brief. Robert violated the rule by failing to include in any of his appendices an index of the record of the proceedings below and by failing, in many instances, to include copies of the orders appealed from and notice of appeal. Instead, the appendices of Robert's briefs contain various documents which were not part of the record on appeal and were immaterial to the issues before us. Robert's violations of Rule 342(a), particularly his failure to index the contents of the voluminous record on appeal, caused an undue burden upon Judith and this court, especially since he omitted at times to cite to the record during his arguments. (87 Ill. 2d R. 341(e)(7).) Under other circumstances, we would have exercised our discretion to strike the appendices (*Finance America v. Econo Coach* (1981), 95 Ill. App. 3d 185, 419 N.E.2d 935) and would have required Robert to file a proper appendix. We decided not to do so in this case, however, in light of our desire for this protracted litigation to come to a close.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part, modified in part, and reversed in part.

Affirmed in part; modified in part; and reversed in part.

CAMPBELL and O'CONNOR, JJ., concur.