*In re* MARRIAGE OF RALPH L. SCAFURI, Petitioner-Appellant, and PAMELA A. SCAFURI, Respondent-Appellee.

Second District   No. 2—89—1131

Opinion filed October 2, 1990.—Rehearing denied November 5, 1990.

Howard W. Broecker, of Howard W. Broecker & Associates, Ltd., of Geneva, and Evan James Mammas, of Mammas & Goldberg, of Chicago (Jerry S. Goldberg, of counsel), for appellant.

Benedict Schwarz II, of Schwarz & Golden, Ltd., of West Dundee (Patricia Piper Golden, of counsel), for appellee.

JUSTICE McLAREN delivered the opinion of the court:

Petitioner, Ralph Scafuri, appeals from several orders entered by the circuit court of Kane County relating to issues surrounding his dissolution of marriage from respondent, Pamela Scafuri. Ralph alleges seven instances of error: (1) the court's child support award was based upon erroneous calculations of Ralph's net income; (2) the court's award of $10,000 per month in child support was excessive; (3) the court's valuation of Ralph's interest in a medical practice was improper; (4) the court's distribution of marital assets was improper; (5) the court's reservation of maintenance for five years was improper; (6) the court's imposition of an interest rate of 1% over prime on a $375,000 "balancing" cash payment to Pamela was improper; and (7)

the court's order requiring Ralph to pay 90% of Pamela's attorney fees was improper.

The parties were married on December 27, 1972, and had three children. Ralph graduated from medical school in 1976 and is an orthopedic surgeon. He is a part owner of Orthopedic and Spine Surgery Associates (OSSA) and Orthopedic and Sports Rehabilitation Clinic Management, Inc. (OSRCM). Ralph filed a petition for dissolution of marriage on January 27, 1987. A hearing to resolve all issues was begun on January 25, 1988.

Ralph and Pamela each testified as to their respective education and employment backgrounds, present and potential income and expense levels, vacation expenses, assets and liabilities, and child care responsibilities. Ralph also testified in detail as to his business and investment interests. Ralph also presented testimony from several other witnesses to explain the financial details of his medical practice and other business interests. Each party presented expert testimony as to the value of Ralph's medical practice and other various business and investment interests. Likewise, each party presented expert testimony as to the value of the marital residence.

The court rendered a written memorandum of opinion on August 2, 1988, and entered a judgment of dissolution on January 5, 1989. The judgment order awarded the parties joint custody of their three children with physical custody placed with Pamela. A visitation schedule was also set forth in the order. The court also ordered Ralph to pay $10,000 per month for child support. The court noted that this sum represented approximately 32% of Ralph's statutory net income as found by the court.

The court reserved the question of maintenance for a period of five years. The court found this to be necessary as "the level of future earnings and needs of the parties is uncertain," and "[t]he ability to review financial data for future periods (upon motion by any party hereto) will be necessary to assess fairly this issue in the next five (5) years."

The court also made a property distribution award. The court found that it was necessary to give Pamela a "balancing" cash award of $375,000 due to the substantial portion of marital property represented by Ralph's medical practice. The court also ordered this sum to be paid in quarterly installments over a 10-year period. Ralph was ordered to pay interest at the rate of 1% over prime on the unpaid balance. The court found that these payments would make the overall division of marital property approximately 55% to Pamela and 45% to Ralph.

On February 6, 1989, Ralph filed a post-trial motion for rehearing, retrial, modification, or to vacate the order of January 5, 1989. On April 17, the court conducted a hearing on the post-trial motion and the remaining issue of attorney fees. On July 26, the court entered an order denying Ralph's motion and ordering Ralph to pay approximately $68,000, about 90%, of Pamela's attorney fees. The court modified the award of attorney fees in August and September with the final order being entered on October 2. The court found Pamela to be liable to her attorneys for the sum of $74,516. Ralph was ordered to pay $67,064 of this obligation with the remainder charged to Pamela.

Ralph filed a notice of appeal attacking the court's orders of January 5, July 26, August 16, September 12, and October 2, 1989.

The first contention we address is that the court erred in calculating Ralph's net income for child-support purposes. Ralph argues that the court erroneously inflated several items of income and disregarded several debt obligations in arriving at net income. Specifically, Ralph argues that the court erred by including $22,500 of income from OSRCM, and $40,000 of income from OSSA's reserve account in Ralph's net income. Ralph asserts that the $22,500 figure should really be only $14,500, and the $40,000 figure should be omitted in its entirety. Additionally, Ralph objects to the court's treatment of several debt obligations. Ralph contends that these obligations represent "[e]xpenditures for repayment of debts that represent reasonable and necessary expenses for the production of income" (Ill. Rev. Stat. 1989, ch. 40, par. 505(a)(3)(h)) and should have been deducted from income to arrive at net income. Although Ralph points out that the court did not make specific findings regarding net income in its January 5, 1989, judgment order, the court did set forth a detailed discussion of its determination of net income in its opinion letter of August 2, 1988.

■ The trial court's letter opinion is quite clear in demonstrating that the court carefully reviewed the appropriate factors in arriving at net income. The court based its net income determination on the figures contained in Pamela's trial brief with certain adjustments. The court also rejected several items of indebtedness as set forth by Ralph. The court specifically discussed and provided its reasoning for rejecting the three items of indebtedness that Ralph claims should have been deducted to arrive at net income. These findings are within the trial court's discretion. The court did not abuse its discretion in determining net income.

Ralph next contends that the court erred in awarding child sup-

port of $10,000 per month. Since the parties had three children, the court used the statutory guideline of 32% of Ralph's net income to determine the amount of support to be paid. (See Ill. Rev. Stat. 1989, ch. 40, par. 505(a)(1).) Ralph argues that using the guideline was error in this case and the court should have deviated downward from the guideline.

■■ The amount of a child support award is within the discretion of the trial court and will not be disturbed absent an abuse of discretion. (*In re Marriage of Dwan* (1982), 108 Ill. App. 3d 808, 812.) The guidelines establish a beginning point for analysis. (*In re Marriage of Blaisdell* (1986), 142 Ill. App. 3d 1034, 1040.) "No judge should, or properly could, surrender the responsibilities of considering all relevant factors dictated by Illinois law in reaching an appropriate result." (*Blaisdell*, 142 Ill. App. 3d at 1040.) The guidelines shift the burden of presenting evidence to the parent who is asking the court to deviate from the guidelines in setting a child support award. *In re Marriage of Rogliano* (1990), 198 Ill. App. 3d 404, 411.

Ralph contends that he met his burden of establishing that the child support award should have been below the statutory guideline. Ralph argues that the affidavit submitted by Pamela in which she claimed monthly expenses totaling $11,371 was impeached and shown to be an inaccurate reflection of the needs of the three Scafuri children. Ralph contends that, after disregarding the impeached portions of Pamela's affidavit, the actual needs of the children and Pamela are approximately $6,500 per month, and this figure should be further reduced by the portion attributable to Pamela's needs. Ralph points out that, while receiving temporary support, Pamela purchased home furnishings, took several vacations and placed sums of money in both demand and investment accounts. Ralph contends that, since Pamela was able to expend such sums when Ralph's support contribution was approximately $8,000 per month, an award of $10,000 per month is more than the children need.

■■ Initially, we note that a child support award is not limited to the "shown needs" of the children. (See *In re Marriage of Bussey* (1985), 108 Ill. 2d 286, 297.) A court may award support in excess of the needs of the children (*In re Marriage of Boyden* (1987), 164 Ill. App. 3d 385, 388), or in deviation from the guidelines (see Ill. Rev. Stat. 1989, ch. 40, par. 505(a)(2)) if necessary to enable the children to enjoy the standard of living they would have had if the marriage had not been dissolved. Ralph contends that the standard of living that the children would have enjoyed had the marriage not been dissolved does not require a $10,000-per-month support payment.

The court noted in its July 26, 1989, order that the support award clearly exceeded the current needs of the children and reflected a response to the standard of living the children would have enjoyed had the marriage continued. The trial court found that an element of the children's standard of living is the presence of Pamela in the home instead of in the work force. The court went to great lengths to explain the importance of Pamela remaining at home to nurture and tend to the children's physical, educational and emotional needs. The court stated that it took into consideration "all appropriate factors" when arriving at a child-support award of 32% of net income. We interpret this to mean that, after considering the appropriate factors, the court was not inclined to deviate from the statutory guideline. We believe this to be an abuse of discretion.

■ One commentator has expressed the view that the support schedules contained in the statute have less utility as the net income of the parties increases because the schedules are premised upon percentages related to average child-rearing expenses. (See K. Levin, *The Use (and Abuse) of Child Support Schedules in Illinois*, 71 Ill. B.J. 314 (1983).) We agree with this assessment. When dealing with above-average incomes, the specific facts of each case become more critical in determining whether the guidelines should be adhered to.

In the case at bar, the facts establish that, while the children enjoy a very comfortable lifestyle, they are not accustomed to a lavish or extravagant lifestyle. Pamela's affidavit contains expenses that are reasonably related to "lifestyle." These expenses include, *inter alia*, restaurants, clothes, sports, lessons, vacations, camp and entertainment. We agree with Ralph that many of the expenses listed do not reflect the current needs of the children. For example, the expenses related to the Galena home which are now Ralph's exclusive responsibility are not needs of the children.

Additionally, we point out that the trial court stated in its order:

"6. The probable future income of the wife, her ability to acquire assets and her probable standard of living are enormously less than the husband's. Her independent gross income is less than 2% of his net income. Even considering the child support, her income is 35% of his. If broken down per person, the wife and three children receive $31,250.00 each. The husband after payment of child support, receives $237,000 for support of himself alone. The ratio is nearly 8 to 1."

While we cannot be certain from this passage that the court intended a portion of the child support award to be ersatz maintenance for Pamela, we note that any such practice would be improper. Child sup-

port is for the support of the children, and maintenance is for the support of the spouse. While the two concepts are related, one should not be substituted for the other.

▪ We conclude that, after a thorough review of all the evidence presented, the children's shown needs and lifestyle to which they are accustomed can be adequately maintained on a total award of $6,000 per month for the three children. Rather than remand this cause and protract the litigation, we shall reduce the award pursuant to our authority to do so. See 107 Ill. 2d R. 366(a)(5); *In re Marriage of Hirsch* (1985), 135 Ill. App. 3d 945, 959.

Ralph next argues that the court erred in valuing his interest in the medical corporation at $600,000. Ralph contends that the issue boils down to whether goodwill exists in a professional service practice. Ralph's expert testified that there was no goodwill in the medical corporation. Therefore, Ralph's interest was valued at $193,200. Pamela's expert testified that goodwill did exist in the corporation. Therefore, Ralph's interest was valued at $730,000.

▪ Recently, this court has reiterated its position that goodwill does exist and should be included in the value of a professional practice. (*In re Marriage of Feldman* (1990), 199 Ill. App. 3d 1002, 1005-06; see also *In re Marriage of Rubinstein* (1986), 145 Ill. App. 3d 31, 37; *In re Marriage of Leon* (1980), 80 Ill. App. 3d 383, 386.) The court did not err by including goodwill in the value of Ralph's interest.

With respect to the overall valuation of Ralph's interest in OSSA, the trial court reviewed the testimony and opinions of Robert Kleeman, Ralph's expert witness. Kleeman stated that he did not include an amount for goodwill in his $193,000 valuation of Ralph's interest because there was no enterprise goodwill. The court questioned Kleeman's $630,000 valuation of OSSA as he did not take into consideration the value of a corporate asset valued at $525,000 by Daniel Kennedy, a certified public accountant who testified on Ralph's behalf. The court concluded that Kleeman's opinion was "so flawed and so lacking in reasonable support, research or understanding that it must be rejected."

The court also reviewed the testimony of Dwain Tataryn, Pamela's expert. Tataryn placed a value of approximately $2,919,000 on OSSA, and a corresponding value of $730,000 on Ralph's 25% interest therein. The court also noted some weaknesses in Tataryn's opinion.

The court also considered an employment contract titled "Fister Buy-in Agreement." This document was executed when Dr. Fister

joined the practice in 1984. Dr. Fister requested Kenneth Schwartz, the business manager of OSSA, to calculate the cost of a one-quarter interest in OSSA. Schwartz did so and placed a value of $450,000 on the one-quarter interest.

The court reviewed the testimony of Daniel Kennedy. Kennedy testified that he is intimately aware of the history of OSSA, having been associated with the corporation since its creation as a partnership. The court also noted that Kennedy had placed the value of Ralph's share in OSSA at $609,000 in April 1986. Kennedy testified that this was in error, however, because he mistakenly calculated a one-half interest in OSSA and not the one-third interest that Ralph really had at that time. The court noted that if $609,000 was equal to one-half of OSSA, then OSSA in total was valued at $1,218,000, and a one-third interest would have been worth $406,000 in April 1986. The court also set forth the fact that gross receipts of OSSA were $1,524,217 in 1984 and $3,232,021 in 1987. This represents a 212% increase. The court concluded the valuation portion of its letter opinion by stating:

> "The court has carefully considered all of the foregoing *** and considering all other relevant factors the court finds the value of the husband's interest in OSSA to be $600,000."

The court considered all the testimony concerning the valuation of OSSA. There is sufficient evidence in the record to support the court's finding that Ralph's one-quarter interest in OSSA is worth $600,000. Therefore, the court did not abuse its discretion in placing such a value on his interest.

■ Ralph next contends that the court abused its discretion in distributing the marital property. The trial court, in its letter opinion and judgment order, stated that the distribution of marital assets constituted an award of 55% of the assets to Pamela and 45% to Ralph. The court further stated in its letter opinion:

> "Again, considering all of the factors suggested under Section 503 of Chapter 40 (Ill. Rev. Stat. 1987, Ch. 40, Sec. 503) including the tax impacts, probability of future acquisition of capital assets and the enormous difference in future earning capacity, this is considered an appropriate disposition by this Court."

The distribution of marital property rests within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *In re Marriage of Bentivenga* (1982), 109 Ill. App. 3d 967, 971.

■ In the case at bar, it is obvious that Ralph's ability to earn income and acquire assets in the future is far superior to that of

Pamela. While Pamela is a certified special education teacher, the evidence indicates that her salary, were she to return to teaching, would be approximately $18,000 per year. Ralph's gross income is approximately 25 times this amount. It is clear that the court considered all the appropriate factors in distributing the marital assets. We find the trial court's decision regarding distribution of assets to be a proper exercise of its broad discretion.

. Ralph also contends that the court erred by reserving the issue of maintenance for a five-year period. Ralph first argues that Pamela received sufficient marital assets to maintain herself. Therefore, she is not entitled to maintenance. Ralph also argues that section 504(b) of the Illinois Marriage and Dissolution of Marriage Act introduces the concept of rehabilitative maintenance and the inherent, affirmative duty of a recipient spouse to seek financial independence through employment and, if necessary, education and training. (See Ill. Rev. Stat. 1989, ch. 40, par. 504(b); *In re Marriage of Mittra* (1983), 114 Ill. App. 3d 627, 634.) Pamela is an educated woman, and Ralph asserts that she has the ability to provide for her own support through gainful employment.

The pertinent portion of the court's letter opinion states:

> "The five year period should give the wife an opportunity to determine whether she can maintain herself and her children on the support ordered, as from time to time modified, and whether she can demonstrate good reason for not returning to the work force. *** During the five year period of reservation she is free to seek maintenance but must be able to show need on her part as well as the ability of Ralph to pay. This Court is presuming that she will be able to meet all of her own and the children's needs from the support ordered as well as from the income earned on the assets awarded her: to a degree this is speculation since there is no way of knowing, on the current record, what additional earnings she may have. Leaving an open door for a reasonable period seems the appropriate solution."

It is apparent from the court's discussion that the court felt that at this time Pamela had sufficient assets and resources, including child support payments, to provide for the reasonable needs of herself and the children. The court apparently considered that some part of the child support payments would be available to support Pamela. The court did, however, leave the issue of maintenance open for a five-year period. This was apparently done because the court decided that circumstances were such that Pamela should not be required to seek

employment outside the home at this time. This decision was premised on the fact that the children's lifestyle included having their mother at home.

■ There is precedent for the reservation of maintenance in a dissolution proceeding. See *In re Marriage of Cohn* (1982), 93 Ill. 2d 190, 199; *In re Marriage of Smith* (1985), 132 Ill. App. 3d 694, 701; *In re Marriage of Shafer* (1984), 122 Ill. App. 3d 991, 999.

In *Cohn*, the court found that there are circumstances that would justify entering a judgment of dissolution of marriage while reserving the issue of maintenance. (*Cohn*, 93 Ill. 2d at 199.) One such situation is where the responsible party is unable at this time to pay maintenance if so ordered. *Cohn*, 93 Ill. 2d at 199; *Smith*, 132 Ill. App. 3d at 701; see also *Shafer*, 122 Ill. App. 3d at 999 (this court suggested on remand that the trial court take a "reserved-jurisdiction approach" as the husband's present ability to pay a significant amount of maintenance was limited).

Another situation in which a reserved jurisdiction approach has been applied is when the court seeks to monitor the actual circumstances of the parties. In *In re Marriage of Asch* (1981), 100 Ill. App. 3d 293, the trial court awarded maintenance of $150 per week. Additionally, the trial court reserved jurisdiction over the maintenance award for three years to ascertain whether the maintenance recipient had made a reasonable effort to procure suitable employment and become self-sufficient. The court in upholding the maintenance award stated:

> "By reserving the right to review the award after three years to determine whether respondent has made reasonable efforts to find suitable employment, the trial court has chosen a practical alternative designed to avoid the speculation often inherent in future maintenance awards. Rather than speculate regarding the necessity of maintenance three years hence [citation], the trial court added an element of flexibility to its order. If at the end of the three years the court determines that respondent has reasonably sought employment and failed to find anything suitable, the court will undoubtedly decide that the maintenance should continue, possibly at a higher amount. If, however, respondent has chosen not to seek employment and begin supporting herself, the court could then deny her further maintenance." *Asch*, 100 Ill. App. 3d at 298.

In *In re Marriage of Lord* (1984), 125 Ill. App. 3d 1, the court entered an order of dissolution of marriage and reserved the issue of maintenance. At the time of the dissolution, the wife presented medi-

cal evidence to establish that she had symptoms of Raynaud's disease which might develop into a disabling disease. If the wife did become afflicted with this disease, it would most likely occur within a two-year period. The court reserved the issue of maintenance finding that, at the hearing date, the wife was not entitled to maintenance, but if the disease progressed, the distribution of property would be inadequate to meet her needs. (*Lord*, 125 Ill. App. 3d at 4.) This court affirmed the reservation of maintenance under the circumstance presented. *Lord*, 125 Ill. App. 3d at 5.

The case at bar is distinguishable from the cases cited above. Ralph's ability to pay maintenance at this time is not questioned. Also, the court is not seeking to monitor Pamela's efforts to procure suitable employment and become self-sufficient so as to justify a future reduction in the maintenance payments.

Additionally, in *Lord*, the wife had no control over the future consequences that would entitle her to maintenance. In this case, Pamela does have some control. The court has excused Pamela from attempting to support herself through appropriate employment. This means that as time goes by Pamela will be more removed from the labor force. Presumably, the longer she remains unemployed the more difficult it will be for her to obtain employment in the future. The court provided Pamela with $120,000 a year in child support, approximately $50,000 a year in cash payments, and income from property. The court has also allowed Pamela to refrain from working and, if she cannot "maintain herself and her children," to petition the court for more money. Pamela has no incentive to be cost conscious, or to become gainfully employed.

■■ This position is inappropriate. Not only does the five-year reservation of maintenance protract the litigation, but it does not get Pamela moving in the right direction, *i.e.*, towards a position of self-sufficiency. In fact, this allows Pamela to stagnate and move in the wrong direction, *i.e.*, continued dependence. The court should have determined if maintenance was warranted and, if so, ordered it. Furthermore, the award should not have been implicitly included in an excessive child support award. To place Ralph in a position where his future obligations are uncertain and under his ex-wife's exclusive control was an abuse of discretion or, rather, the failure to exercise discretion.

Ralph next contends that the court erred by requiring him to pay interest at the rate of 1% over prime rate on the outstanding balance of the cash balancing award. Ralph argues that section 2—1303 of the Code of Civil Procedure mandates an interest rate of 9%. (Ill. Rev.

Stat. 1989, ch. 110, par. 2—1303.) Pamela argues that section 2—1303 is limited to interest on judgments and does not apply to the situation at bar because the interest is accruing on a cash balancing award, not a judgment.

We find Pamela's argument to be disingenuous. The cash balancing award and attendant interest provisions are set forth in paragraph 9 of an order titled "Judgment of Dissolution." This paragraph is directly below the heading "Property Division." It is obvious that awards pertaining to property distribution are judgments. (See Ill. Rev. Stat. 1989, ch. 40, par. 503(i) ("The court may make such *judgments* affecting the marital property as may be just and may enforce such *judgments*").) (Emphasis added.) Pamela has not cited any authority that stands for the proposition that a "balancing" cash award made as part of a property distribution award is not a judgment. We determine that the "balancing" award is a judgment.

Section 2—1303 of the Code of Civil Procedure provides:

"Judgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied ***. When judgment is entered upon any award, report or verdict, interest shall be computed at the above rate, from the time when made or rendered to the time of entering judgment upon the same, and included in the judgment. Interest shall be computed and charged only on the unsatisfied portion of the judgment as it exists from time to time." (Ill. Rev. Stat. 1989, ch. 110, par. 2—1303.)

It is established that the trial court has the authority to award interest on a judgment for support payments. (See *Finley v. Finley* (1980), 81 Ill. 2d 317, 332.) Additionally, authority exists for the proposition that the interest provisions of section 2—1303 are mandatory and not within the discretion of the trial court. (See *In re Marriage of Morris* (1989), 190 Ill. App. 3d 293, 296-97; *In re Marriage of Passiales* (1986), 144 Ill. App. 3d 629, 640. But see *Robinson v. Robinson* (1986), 140 Ill. App. 3d 610, 612.) It is clear that if an interest award is entered by the trial court, it should be set at the statutory rate. (See *Morris*, 190 Ill. App. 3d at 298; *Passiales*, 144 Ill. App. 3d at 640; see also Ill. Rev. Stat. 1989, ch. 110, par. 2—1303.) Pamela has not provided this court with any authority, nor are we aware of any, that would allow the trial court, in its discretion, to award interest on a judgment at a rate higher than the statute provides. Therefore, the award of interest at the rate of 1% over prime was in error. Pursuant to our authority to do so (107 Ill. 2d R. 366(a)(5); *Hirsch*, 135 Ill. App. 3d at 959), we will reduce the interest rate on the cash balancing

award to the statutory rate of 9% per annum.

Additionally, it appears that the court's order is internally inconsistent with respect to the amount of the quarterly payments to be paid to Pamela. The order states in pertinent part:

> "The 'cash to balance' property award of $375,000.00 shall be paid in quarterly installments over a ten year period. Interest shall accrue on the unpaid balance at the rate of 1% over the prime rate as established by the First National Bank of Chicago (FNBC). *** Example: If FNBC's prime rate on 11/15/88 is 9%, 1% will be added to this to total 10%. 10% interest on the unpaid balance of $375,000.000, amortized (p & i) over 10 years is $14,938.59. $14,938.59 is to reach Pamela by 12/3-88 [*sic*] as payment for the 4th quarter of 1988."

While the first two sentences set forth above appropriately provide for simple interest to be paid (see *Lewis v. Stran-Steel Corp.* (1978), 58 Ill. App. 3d 280, 282), the example describes a different interest calculation.

The first sentence provides for the $375,000 cash balancing award to be paid in quarterly installments over 10 years. This results in 40 payments of $9,375. The second sentence states that interest shall accrue on the unpaid balance at the rate of 1% over prime. Therefore, using the court's assumed prime rate of 9%, Ralph's first quarterly payment would total $18,750. This payment would consist of the $9,375 principal payment ($375,000 / 40) plus $9,375 in interest. ($375,000 x .10)/4. Ralph's second quarterly payment would total $18,515.63 and consist of the $9,375 principal payment plus $9,140.63 in interest. (($375,000 - 9,375) x .10)/4. The monthly payments would be calculated in such a manner until paid in full.

■■ The example set forth by the court provides for payments to be calculated as would be necessary to amortize a mortgage at 10% over 10 years. This would result in 40 equal quarterly payments of $14,872.50. The use of the mortgage amortization formula would result in substantially more interest being paid over the duration of the loan. However, this does not amount to compound interest as Ralph suggests. Compound interest exists when a party has to pay interest on interest. This is not the case in a situation where a loan is amortized over a period of time in equal monthly payments. The reason that the total interest cost is higher is due to the fact that the principal is not being reduced as quickly in the early portion of the loan term. Most of the payments made in the beginning of the term are used to pay interest costs and, therefore, the principal remains relatively constant. It appears that the court wanted the payments to be made according to

an ordinary simple interest calculation, but the example is inconsistent with this approach. As there are distinct advantages to each party depending on which method is used, this issue is remanded to determine by which method the balancing award is to be paid.

Ralph finally argues that the court abused its discretion by ordering him to pay approximately 90% of Pamela's attorney fees. We disagree.

■■■ The allowance of attorney fees and the proportion to be paid by each party are within the trial court's discretion and will not be disturbed on appeal absent an abuse of discretion. (*Bussey,* 108 Ill. 2d at 299.) The party seeking fees must show an inability to pay the fees and an ability of the other spouse to pay the fees. *Bussey,* 108 Ill. 2d at 299-300; *In re Marriage of Erickson* (1985), 136 Ill. App. 3d 907, 916.

■■■ In the case at bar the trial court set forth its findings regarding attorney fees in three separate orders totaling seven full pages. The court clearly stated the factors it considered in apportioning attorney fees. Most noteworthy is the fact that Ralph earned approximately $350,000 per year and Pamela earned less than $5,000 per year. Ralph argues that Pamela will be receiving cash payments of approximately $15,000 per quarter plus interest income from several assets awarded to her pursuant to the court's property distribution award and, therefore, is able to pay her legal fees. Pamela is not required to divest herself of assets awarded to pay her attorney fees. (See *Head v. Head* (1988), 168 Ill. App. 3d 697, 704.) It was not an abuse of discretion to require Ralph to pay a substantial portion of Pamela's attorney fees.

The decisions of the circuit court of Kane County are modified to reflect a child-support award of $6,000 per month as opposed to $10,000 per month, and an interest rate of 9% per annum on the cash balancing award as opposed to the rate of prime plus 1%. The issue of how the cash balancing award is to be paid is remanded solely to clarify the method of calculating the monthly payments. The five-year reservation of maintenance is reversed, and this issue is remanded for the trial court to determine whether Pamela is entitled to maintenance given the disposition of the other financial issues in this cause, and, if so, in what amount. All other decisions of the circuit court are affirmed.

Affirmed in part; reversed in part; modified in part; and remanded.

INGLIS and REINHARD, JJ., concur.